STAR SQUARE AUTO SUPPLY COMPANY ET AL. v. JOSEPH A. GERK ET AL., Appellants.—30 S. W. (2d) 447.

Division One, July 9, 1930.

*Julius T. Muench* and *Oliver Senti* for appellants.

*A. B. Frey* and *Max Sigoloff* for respondents.

972

SEDDON, C.—This is an action in equity to enjoin the defendants, who respectively hold the offices of chief of police and chief of detectives of the police department of the city of St. Louis, from enforcing Section 25 of an Act of the General Assembly of Missouri, approved on July 30, 1921, commonly known as the Motor Vehicle Act (Laws 1921, 1st Ex. Sess., pp. 76-107). The ground of plaintiffs' action is that Section 25 of the Motor Vehicle Act, in so far as such section pertains to motor vehicle tires, is violative of certain designated sections of the State and Federal Constitutions. The plaintiffs are the Star Square Auto Supply Company, a Missouri corporation, and Joseph A. Stiffelman, who was the vice-president and general manager of said corporation at the time of the commencement of the instant action.

The petition alleges, in substance, that the plaintiff corporation is engaged in the business of selling automobile tires and accessories, and operates seven stores, or salesrooms, in the city of St. Louis; that it has purchased, in large quantities, automobile tires made and manufactured by certain named manufactories in various states other than Missouri, and has also purchased automobile tires from a manufactory located in the State of Missouri; that automobile tires are classified as "firsts," "seconds," and "blemished," and that all such tires, regardless of their classification, are manufactured in the same way and by practically the same process; that, by reason of the process of manufacture, some tires, when produced, are perfect and free from

blemishes and defects, and are classified as "firsts," and that other tires, when produced, are slightly imperfect and defective, and are classified as "seconds" and "blemished;" that all tires classified as "firsts" are sold to the public at a greater price than are those tires classified as "seconds" and "blemished;" that "there are no distinguishing numbers placed upon tires, and that it is impossible for anyone to tell from the number on a tire, or from the lack of a number on a tire, or from the want of a number on a tire, whether such tire is a 'first' or a 'second;' that automobile-tire manufacturers do not (follow), and never have followed, the practice, or maintained the practice, of placing a number on a tire for the purpose of distinguishing a tire of one class, or quality, from another of a different class or quality; that any number placed on a tire by the manufacturer in the process of making is not numbered as a distinguishing mark to indicate its quality or class;" that the defendants, on or about May 21, 1926, ordered members of the police force of the city of St. Louis to arrest the plaintiff, Stiffelman, and to take from the possession of the plaintiff corporation, and from the possession of said Stiffelman, as general manager of said corporation, a large number of automobile tires classified as "seconds" and "blemished," without a legal warrant of any kind, and that the police officers, acting under the orders and direction of the defendants, entered the place of business of plaintiff corporation and illegally searched the premises of said corporation and took from the possession of plaintiffs a number of automobile tires, intending to use said tires as evidence against the plaintiff, Stiffelman, in a prosecution of the said plaintiff for the alleged violation of Section 25, of the Motor Vehicle Act of July 30, 1921; that the defendants threaten to continue to arrest the plaintiff, Stiffelman, and other employees of plaintiff corporation, without legal warrant, and to take from the possession of plaintiff corporation, at its various places of business in the city of St. Louis, motor vehicle tires that do not comply with the requirements and provisions of Section 25 of the Motor Vehicle Act of July 30, 1921; that plaintiffs are without adequate remedy at law, and will suffer irreparable damage by reason of the alleged threatened and unlawful acts of the defendants; wherefore, plaintiffs pray that Section 25 of the aforesaid act of July 30, 1921, be declared to be unconstitutional and void, as contravening certain designated sections of the State and Federal Constitutions, and that plaintiff be awarded injunctive relief against the alleged threatened and unlawful acts of the defendants.

Upon the filing of the petition, the circuit court made and entered an order in the action, requiring the defendants to show cause why a temporary injunction should not issue against them. The defendants filed a joint return to the order to show cause, admitting that they, respectively, hold the offices of chief of police and chief of detectives of the police department of the city of St. Louis, but denying

generally each and every other allegation of plaintiffs' petition. By way of further return to the order to show cause, the defendants pleaded the provisions and requirements of Section 25 of the aforesaid act of July 30, 1921, and averred that defendants, in pursuance of the provisions of Section 25 of said act, did cause the plaintiff, Joseph A. Stiffelman, to be arrested on May 21, 1926, for violation of the provisions of Subdivision (b) of Section 25 of the aforesaid act, in that the said plaintiff was then and there selling, and offering for sale, motor vehicle tires on which the original or manufacturer's number, or other distinguishing number, had been defaced, or had been removed therefrom. The cause was tried upon the return so filed by the defendants, said return being deemed and taken as an answer to the petition.

After a trial and submission of the cause, the circuit court entered a judgment perpetually enjoining the defendants, and all members of the police force of the city of St. Louis acting under defendants' orders and direction, from arresting the plaintiffs, or otherwise interfering with the business of plaintiffs, by reason of any alleged violation of the Motor Vehicle Act of July 30, 1921. From the judgment so entered, the defendants were allowed an appeal to this court. This court retains jurisdiction of the appeal because of the several constitutional questions presented and joined by the pleadings, and preserved and saved in defendants' motion for a new trial.

The evidence adduced by plaintiffs tended to show that, on the afternoon of May 21, 1926, several police officers from the automobile bureau of the police department of the city of St. Louis, acting under the orders and direction of the defendants, accompanied one Usery to the place of business and salesroom of the plaintiff corporation, situate at No. 1129 Locust Street in said city, where Mr. Usery, in the presence of the police officers, purchased a motor vehicle tire from one Kahlert, a salesman and employee of the plaintiff corporation. The purchased tire was selected from a stock of motor vehicle tires exhibited for sale at the place of business of plaintiff corporation, and the original or manufacturer's serial number had been removed from, or "buffed off," the motor vehicle tire so purchased from the plaintiff corporation by Mr. Usery. The salesman, Kahlert, and the plaintiff, Stiffelman, who was the general manager of the plaintiff corporation and in charge of its place of business, were thereupon arrested by detective sergeant Norris, a police officer in whose presence and view the motor vehicle tire was purchased by Usery. The police officers also seized and took possession of 58 other motor vehicle tires on display, and openly exhibited for sale, at the place of business of plaintiff corporation, from each of which tires the original or manufacturer's serial number had been removed or defaced. Detective sergeant Norris, having been called as a witness by the plaintiffs, testified as follows:

"I had occasion to visit the store of the Star Square Auto Supply Company, in pursuance of the direction of my superiors, relating to the taking and seizing of certain automobile tires in their possession on May 21, 1926. I believe it was about 3:30 in the afternoon. I was accompanied by a man named Gail B. Usery. He is not connected with the police department. I met him at police headquarters. . . . I did not make a purchase of an automobile tire; Mr. Usery did. I was there at the time. . . . Mr. Usery walked in and asked one of the salesmen there to see some tires. Mr. Kahlert was the salesman who waited on him. He was arrested, too. Prior to the arrest, Mr. Usery asked to see automobile tires, and Mr. Kahlert showed him some tires that were in front of the store, and Mr. Usery looked them over and said he would take one certain tire. It was not marked with any particular name or mark. It might have had marks showing its size. It had no small numbers on the side. We had gone there with the intention of making the arrest if we found a tire without a serial number. I had no warrant for the arrest. I had no search warrant and did not make application for one. My understanding was that it was done under the direction of Mr. Schweitzer, the prosecuting attorney. After the purchase of the tire, it was handed to me and taken to police headquarters. I cannot say where they are now. I took Mr. Kahlert into custody and told him he was under arrest. I did not hear him make any misrepresentation as to the kind of tire he was selling. I did not make known my mission to the officers of the Star Square Company until after the purchase of the tire. After that, I asked for the manager or proprietor, and was referred to Mr. Stiffelman, and I told him he was under arrest. He accompanied me to the station. I had no warrant for his arrest. None of these tires were concealed in any part of the premises so that they could not be seen without any great difficulty. They were on display in the regular course of business. I believe 59 tires, including the one sold, were taken. The one purchased I took for evidence in the prosecution of the case, the sale of a tire without a serial number. The other 58 (tires) I took in compliance with the law that you shall seize and take possession of any tires found without serial numbers. I believe those that we took were all unwrapped. Some of them had numbers on them referring to the size of the tire, but no serial number. That had been removed. Q. Do you know, as a matter of fact, is there any of the tires that you know of that have or has the numbers with the name, the word 'serial' on there? A. All the tires that I know of, or have ever seen, have that on there. Q. Have the name 'serial' on there? A. Yes, 'serial.' Q. 'Serial,' and then follows the number; is that right? A. Follows the number. Q. You are sure about that, now, sergeant? A. Well, I wouldn't be positive of that 'serial' on all of them; some of them have. Q. They merely have numbers? A. They have numbers. Q. You don't know whether those numbers

are the serial numbers, or those numbers are the numbers within the contemplation of this act? A. Well, it's the distinguishing number—what we call the distinguishing number—to know what the number of that tire is. I know that that refers to the tire number; that there are no two tires with that same number. . . . Q. So then, as a matter of fact, you don't know personally what there is to any tire that is known in the trade as distinguishing marks or distinguishing numbers? A. Yes, I believe I do, in my experience— Q. That is, as an automobile user? A. No; as a—well, you might say, in recovering of stolen automobile tires. We have recovered a great many, and gone by that number. Q. Sergeant, your idea is that the serial number on a tire is the distinguishing number; is that it? A. Yes. Q. In what way does it distinguish it? A. I found that those numbers are not similar on any tires. They are all a different number. I have traced back tire numbers, and found the owners of automobiles by the record kept at tire dealers—some tire dealers. In other words, I would find, say, a Miller tire with the number on it, and I would take that number and go to the Miller agent and he would tell me whom he sold a tire bearing that number to." Cross-examination: "Q. Was there any number on that tire, at all, purchased by Mr. Usery? Of your own knowledge, sergeant? A. As I said before, there may have been some numbers showing the size of the tire. Q. Was there any other mark on the tire? A. No, sir; no other. Q. Any evidence of a removal of numbers or figures of any kind? A. Yes, there was evidence of the removal of figures or numbers, and name. Q. What did you see there, sergeant? A. Well, the tire, I saw the tire and where the name had been buffed off, and the place where the number is was buffed off. Q. Now, will you please tell the court, sergeant, whether or not the clerk or the salesman made any statement to you of the automobile tire number? A. He said the name had been removed. Q. Is that all he said, sergeant? Did he say anything about a number? A. Name and number. Q. He said that the name and number had been removed? A. Yes, sir. I do not know by whom they had been removed. The clerk said nothing about who had removed them, and I didn't ask him."

Plaintiffs also adduced evidence tending to show that all of the leading automobile tire manufactories, except one, are located in other states than Missouri; that all automobile, or motor vehicle, tires are manufactured in the same way and by the same process; that all motor vehicle tires originally come out of the molds with serial numbers molded thereon; that, upon the completion of the manufacturing process, if any motor vehicle tire is found to be defective or blemished, the serial number and (in some instances) the name of the manufacturer are defaced or removed from the defective tire by the tire manufacturer at the manufactory; that defective automobile tires from which the original or manufacturer's serial numbers have been

removed or defaced are classified as "seconds;" that automobile tires classified as "seconds" sell at retail for 25 to 40 per cent less than the retail sale price of a No. 1, or perfect, tire; that the original serial numbers are usually removed, or "buffed," from defective or "second class" tires with a steel buffer, or with an emery wheel, although some of the tire manufactories deface the original serial number on a defective tire by stamping the word "second" across the original serial number; that the chief purpose of defacing or removing the original serial number from a defective tire is to indicate that the tire is not to be sold under the "standard manufacturer's guaranty or warranty," a contractual form of warranty adopted by the Rubber Association of America, which association comprises in its membership the leading automobile tire manufacturers of the United States; that all automobile tires bearing serial, or manufacturer's, numbers are classified as "firsts," or No. 1 grade, and are guaranteed under the "standard warranty" to be free from defects in material or workmanship; that, ordinarily, no record of the original serial numbers of tires is kept by retail dealers and sellers of automobile tires; and that guaranteed, or No. 1, tires are usually enclosed in paper wrappers, and unguaranteed tires, from which the original or manufacturer's serial numbers have been defaced or removed, are usually not wrapped. One of plaintiffs' witnesses testified: "First-class tires of the same size and same quality can be identified by the manufacturer's or serial numbers. That is the only means of identification." The evidence is uncontroverted that the plaintiff corporation did not itself buff, deface or remove the original or manufacturer's serial numbers from any motor vehicle tires displayed and sold in any of its several stores or places of business in the city of St. Louis, but that all of the motor vehicle tires (in the possession of the plaintiff corporation) from which the original or manufacturer's serial numbers had been defaced or removed were purchased by the plaintiff corporation from tire manufacturers, or from tire jobbers, at places located outside of the State of Missouri, and that the original or manufacturer's serial numbers had been defaced or removed from such tires before delivery thereof to the plaintiff corporation.

I. The plaintiffs (respondents here) contend that Section 25 of the Motor Vehicle Act, which act was approved by the Governor of this State on July 30, 1921, is invalid because it is violative of certain designated sections of the State and Federal Constitutions, in so far as said section of the act purports to be applicable to motor vehicle tires. The circuit court found the issues for plaintiffs, and ruled Section 25 of the Motor Vehicle Act to be unconstitutional and void, as applied to the plaintiffs. The defendants (appellants here) assign error in the ruling and action of the circuit court.

The act in question was enacted at the first extra session of the Fifty-first General Assembly, which was duly convened by proclamation of the Governor on June 14, 1921, and the act is fully set out in the Laws of Missouri, 1921, First Extra Session, pages 76 to 107. The act has relation to the general subject of motor vehicles, and the title to the act reads as follows:

"An Act to repeal chapter 71, Revised Statutes of Missouri of 1919, entitled 'Motor vehicles' and to enact in lieu thereof a new chapter providing for the registration of, fees to be charged and collected therefor, and the display of number plates on motor vehicles and trailers; providing for certificates of ownership of motor vehicles and trailers and the assignment and transfer thereof; regulating the sale of registered motor vehicles and trailers; providing for the registration of manufacturers of and dealers in motor vehicles and trailers; providing for the registration of certain operators of motor vehicles and trailers; regulating the speed and equipment of motor vehicles on the highways; requiring vehicles to display certain lights and regulating the use thereof on the highways; prescribing rules of the road and regulating the use of vehicles on the highways; prohibiting and defining the unauthorized use of motor vehicles; prohibiting vehicles of certain size, weight and construction from using the highways; authorizing cities, towns and villages to make certain regulations and to collect license taxes on motor vehicles and trailers; providing for the appointment of a commissioner of motor vehicles and necessary employees to enforce the provisions of this act, and providing for their compensation; defining offenses relating to the registration, regulation, ownership, sale, use and theft of motor vehicles and the use of the highways by vehicles; defining certain terms and words as used in this act; regulating motor vehicle manufacturers, dealers and public garages; repealing all laws and parts of laws contrary to, inconsistent or in conflict with the provisions of this act; repealing and superseding all ordinances or regulations contrary to, inconsistent or in conflict with the provisions of this act; prescribing penalties for the violation of this act."

Section 25 of the act, which is the particular section here in controversy, reads (in part) as follows:

"Removing, altering or defacing manufacturers' numbers.—(a) No person shall destroy, remove, cover, alter, deface, or cause to be destroyed, removed, covered, altered or defaced, the manufacturer's number, the motor number or other distinguishing number on any motor vehicle, or number or other distinguishing number on any motor vehicle tire, the property of another for any reason whatsoever.

"(b) No person shall sell, or offer for sale, or shall own or have the custody or possession of a motor vehicle, trailer or motor vehicle tire on which the original or manufacturer's number or other distinguishing number has been destroyed, removed, covered, altered or

defaced, and no person shall sell, offer for sale, own or have the custody or possession of a motor vehicle or trailer having no manufacturer's number or other original number, or distinguishing number; provided, however, that any person being the owner or custodian of, or having possession of a motor vehicle, trailer or motor vehicle tire at the time of taking effect of this act, the original number of which has been previously destroyed, removed, covered, altered or defaced, shall, within thirty (30) days after the taking effect of this act, apply to the commissioner, on a blank to be prepared and furnished by said commissioner, for permission to make or stamp, or cause to be made or stamped on such motor vehicle, trailer or motor vehicle tire, a special number; the application for such permission shall contain a description of the motor vehicle, trailer or motor vehicle tire, the name and address of the applicant, the date on which he acquired the property or the possession thereof, and the name and address of the person from whom he acquired it and such other information as may be required by the commissioner. . . .

"(d) It shall be the duty of every sheriff, constable and police officer in this state having knowledge of a motor vehicle, trailer or motor vehicle tire, the number of which has been removed, covered, altered, destroyed or defaced, and for which no special number has been issued, to immediately seize, take possession of such motor vehicle, trailer or motor vehicle tire, arrest the supposed owner or custodian thereof, and cause prosecution to be begun in a court of competent jurisdiction and said court shall retain the custody of the motor vehicle, trailer or motor vehicle tire pending the prosecution of the person arrested, and in case such person shall be found guilty, such motor vehicle, trailer or motor vehicle tire shall remain in the custody of the court until the fine and costs of prosecution shall be paid, in which event such property shall not be released until a special number shall have been issued by the commissioner, as provided for herein, on an application of the supposed owner, approved by the court. In case such fine and costs shall not be paid within thirty (30) days from the date of judgment, the court shall proceed to advertise and sell such motor vehicle, trailer or motor vehicle tire in the manner provided by law for the sale of personal property under execution; said advertisement shall contain a description of the motor vehicle, trailer or motor vehicle tire and a copy thereof shall be mailed to the commissioner. The proceeds of such sale shall be applied, first, to the payment of the fine and costs of the prosecution and sale, and any sum remaining shall be paid by the court to the owner, and the motor vehicle, trailer or motor vehicle tire shall not be delivered to the purchaser thereof until he shall first have secured a special number from the commissioner as provided for herein, on the application of the purchaser, approved by the court. If at any time while such motor vehicle, trailer or motor vehicle tire remains in the custody of the court or officer, the true owner thereof

shall appear and establish his title thereto to the satisfaction of the court, the same shall be returned to the owner after he has obtained from the commissioner a special number as provided for herein, on application made by said owner. . . . ''

Section 29 of the act, in substance, provides that any person who violates Subsection (b) of Section 25 of the act shall, upon conviction thereof, be punished by a fine of not less than five dollars or more than five hundred dollars, or by imprisonment in the county jail for a term not exceeding two years, or by both such fine and imprisonment. A violation of Subsection (a) of Section 25 of the act is made a felony, punishable by imprisonment in the penitentiary or by confinement in the county jail, or by fine, or by both fine and imprisonment.

It is insisted by respondents that Subsection (b) of Section 25 of the aforesaid act, in so far as the same relates to motor vehicle tires, is unconstitutional and void in that it is violative of Section 28, Article IV, of the Constitution of Missouri, which provides that ''no bill . . . shall contain more than one subject, which shall be clearly expressed in its title.'' Respondents' insistence is predicated upon the ground that motor vehicle tires are not specifically mentioned in the title of the Motor Vehicle Act, as being included in the subject-matter of the act.

The evident object and purpose of the aforesaid requirement of the organic law of this State is that the title of every legislative act shall indicate the general contents or subject-matter of the act, which may be expressed in the title in a few or greater number of words; and if the title does not tend to mislead the public and the members of the Legislature as to the contents and subject-matter of the legislative act, and if the title is not designed as a surreptitious cover to vicious and incongruous legislation, having no reasonable and natural relation to the subject expressed in the title, then such title does not impinge on, or violate, the constitutional requirement and mandate. [St. Louis v. Weitzel, 130 Mo. 600, 616.] While the constitutional requirement is mandatory, nevertheless it is the universal policy of the judiciary to give to the constitutional requirement a reasonable and liberal application and construction, so as not to unreasonably hamper or cripple proper legislation on the one hand, but so as to prevent trickery and the surreptitious enactment of vicious and incongruous legislation on the other hand. [25 R. C. L. 837, 838; 36 Cyc. 1017, 1018.] As is said by our own court, in banc, in a case recently decided: ''We resolve the doubt, if any, in favor of validity, if the challenged legislation is germane and relates either directly or indirectly to the main subject'' of the act as expressed in its title. [State ex rel. Lorantos v. Terte, 324 Mo. 403, 23 S. W. (2d) 120, 121.] In the last cited case, this court approvingly quoted the applicable principle of law, as stated in 25 R. C. L. 858: ''A title need not dis-

close the means and instrumentalities provided in the body of the act for accomplishing its purpose; where all the provisions are reasonably necessary as means for attaining the object of the act indicated by the subject which is expressed in the title they are considered as included in the title as subdivisions of the general subject there stated.''

The title of the act here in question discloses that the legislation deals with the general subject of motor vehicles, and that the body of the act has regard to, and defines, ''offenses *relating to* the . . . ownership, sale, use and *theft* of motor vehicles.'' Thus, it is made apparent by the title that one of the main objects and purposes of the act is to legislate against the theft of motor vehicles, and to define various ''offenses *relating to*'' such object. It is a matter of common knowledge that motor vehicles are frequent subjects of larceny, and this to such an extent that the Federal Congress, on October 29, 1919, deemed it essential to the welfare of the nation to enact the National Motor Vehicle Theft Act (U. S. C., Title 18, Sec. 408), which Federal legislation makes it a felony for any person to transport, receive, conceal, store, barter, sell, or dispose of any motor vehicle which is moved in interstate commerce, knowing such motor vehicle to have been stolen. It is also a matter of common knowledge that, in order to prevent and hinder the identification, tracing and recovery of a stolen motor vehicle, the manufacturer's serial number, or other distinguishing or identifying number, originally placed on the motor vehicle by the manufacturer, frequently is destroyed, removed, altered or defaced by the thief or thieves. The tires of a motor vehicle are indispensable and integral parts of such vehicle; without tires, the motor vehicle is wholly incapable of being used as a vehicle of transportation. In other words, the tires are as essential to the operative use of the vehicle as is the motor or gasoline engine which propels it. A motor vehicle without tires may be appropriately likened to a ship without a rudder. The serial numbers originally placed by the manufacturer on the tires (which tires, when attached thereto, become integral and indispensable parts of the motor vehicle) furnish additional means of tracing, identifying and recovering a stolen motor vehicle; and likewise the destruction, removal, alteration or defacement of the original or manufacturer's numbers on the tires of a motor vehicle tends to hinder and prevent the identification, tracing and recovery of such motor vehicle when stolen. It is a well known fact that it is a common and frequent practice of automobile thieves to remove the tires from a stolen motor vehicle, and to sell, or attempt to sell, the tires so removed from the stolen motor vehicle, after first destroying, altering, or defacing the distinguishing or identifying numbers, or other marks of identification, originally placed thereon by the manufacturer of the tires, thereby hindering and preventing the tracing, identification and recovery of the stolen tires, and the stolen motor

vehicle (of which such tires had theretofore been indispensable and integral parts) as well. It was for the obvious purpose of preventing such prevalent character of larceny, and of affording a means for the identification, tracing and recovery of stolen motor vehicles, and for the apprehension, arrest and conviction of thieves, and their accomplices, engaged in such prevalent character of larceny, that the legislatures of this and other states have enacted stringent laws similar in terms and requirements to the act here in question. The provisions of Section 25 of the Act under review, relating to the sale, ownership and possession of motor vehicles, trailers, and motor vehicle tires on which the original or manufacturer's number, or other distinguishing number, has been destroyed, removed, covered, altered or defaced, are germane, and have a natural and reasonable relation, to the general purpose and main subject announced in the title of the act, namely, "defining offenses relating to the theft of motor vehicles." The provisions of Section 25 of said act are not incongruous, but are naturally related and germane to the main subject announced in the title; and therefore the act under review does not contravene the mandate of Section 28, Article IV, of the State Constitution. [State v. Miller, 45 Mo. 495; St. Louis v. Liessing, 190 Mo. 464; State v. Brodnax, 228 Mo. 25; Coca Cola Bottling Co. v. Mosby, 289 Mo. 462; State v. Tallo, 308 Mo. 584; State ex rel. Garvey v. Buckner, 308 Mo. 390; Cunningham v. Railroad Co. (Mo. Sup.), 215 S. W. 5; Blind v. Brockman, 321 Mo. 58, 12 S. W. (2d) 742; Brown v. State, 323 Mo. 138 (en Banc), 19 S. W. (2d) 12; State ex rel. Hollaway v. Knight, 323 Mo. 1241 (en Banc), 21 S. W. (2d) 767; State ex rel. Lorantos v. Terte, 324 Mo. 403 (en Banc), 23 S. W. (2d) 120.]

II. The respondents assert that Subsection (b) of Section 25 of the Motor Vehicle Act is violative of Section 53, Article IV, of the Missouri Constitution, which provides, *inter alia,* that "the General Assembly shall not pass any local or special law: . . . regulating labor, trade, mining or manufacturing." It is argued that Section 25, Subsection (b), of said act purports to regulate the sale and manufacture of motor vehicle tires, without regulating the sale and manufacture of other automobile parts and accessories, and therefore amounts to special or class legislation, in that the act creates a class consisting of a single automobile part or accessory, and does not require other motor vehicle parts of the same kind and character, such as wheels, rims, horns, motometers, bumpers, and automobile batteries, to bear an original or manufacturer's serial number. The precise question thus presented for decision is whether the classification made by Subsection (b) of Section 25 of the Motor Vehicle Act is reasonable, and not arbitrary, in view of the legislative purpose in enacting said law.

In State ex rel. v. Gordon, 245 Mo. 12, l. c. 33, this court, en banc, stated the applicable rule, as follows (quoting 26 Am. & Eng. Ency. Law, p. 683): "In order to determine whether or not a given law is general, the purpose of the act and the objects on which it is intended to operate must be considered. If these objects are distinguished from others by characteristics evincing a peculiar relation to the legislative purpose, and showing the legislation to be reasonably appropriate to the former and inappropriate to the latter, the objects will be considered, as respects such legislation, to be a class by themselves, and legislation affecting such a class to be general."

In State ex rel. v. Chicago, Burlington & Quincy Railroad Co., 246 Mo. 512, 514, we said: "The constitutional prohibitions against class legislation and the denial of equal protection of the laws in no wise deprive the Legislature of all discretion in the matter of defining the classes to which its enactments shall apply, and it is only when the classification attempted is arbitrary, unreasonable and unjust that these constitutional provisions inhibit such legislative action."

In State ex inf. v. Hedrick, 294 Mo. 21, l. c. 73-75, this court, en banc, thus stated the rule applicable to the classification of subjects or objects by legislative enactment: "Early in the history of the consideration of the question whether an act was to be held invalid as special legislation and in conflict with Section 53 of Article IV of the Constitution, this court announced that such 'question should be approached with great caution and should be considered with the utmost care and deliberation. The nullity and invalidity of such a law must appear beyond a reasonable doubt before we can assume to pronounce it void. The rule is founded on the fact that the judiciary ought to accord to the Legislature as much purity of purpose as it claims for itself; as honest a desire to obey the Constitution, and, also, a high capacity to judge of its meaning.' . . . The question is not whether, considering all the circumstances which exist, the Legislature might not constitutionally make a law which would include a larger class. On the contrary, it is whether it appears beyond a reasonable doubt that there are no distinctive circumstances appertaining to the class with respect to which it has legislated which reasonably justify its action in restricting the operation of the law to the persons, objects or places to which the law is made applicable. . . . 'Legislative classification does not have to be so broad and comprehensive as to include all the evils which might by possibility be brought within its terms. Classification must be accommodated to the problems of legislation, and must be palpably arbitrary to authorize a judicial review of it. It cannot be disturbed by courts, unless they can see clearly that there is no fair reason for the law that would not require with equal force its extension to others, whom it leaves untouched. It is competent for a legislature to determine upon what differences a distinction may be made, for the purpose of statu-

tory classification, between objects otherwise having resemblance, though such power cannot be arbitrarily exercised, and the distinction must have a reasonable basis.' [Stewart v. Brady, 133 N. E. 1. c. 314.]''

This court, en banc, has very lately reannounced the applicable rule, in State ex rel. v. Knight, 323 Mo. 138, 21 S. W. (2d) 767, 1. c. 770, as follows: ''Before the act of the General Assembly can be declared to be a special law because the classification of the persons, objects, or places to which the act applies is arbitrary or (and) unreasonable, it must be made to appear beyond a reasonable doubt that 'there are no distinctive circumstances appertaining to the class with respect to which it has legislated which reasonably justify its action in restricting the operation of the law to the persons, objects or places to which the law is made applicable.' The legislative act must not be viewed with a harsh, critical, or unfriendly eye. It merits indulgence of the presumption, not only of the fairness and good faith of the lawmaker, but also that the act has been enacted in conformity to constitutional requirements.''

Applying the aforestated test as repeatedly announced by this court, and having in mind the evident purpose of the General Assembly in enacting the Motor Vehicle Law in question, which legislative purpose obviously was to facilitate the tracing, identification and recovery of stolen motor vehicles, trailers and motor vehicle tires, we cannot say that it appears beyond a reasonable doubt that there are *no* distinctive circumstances appertaining to the class created by the act, and with respect to which the General Assembly has legislated, which reasonably justify the legislative action in restricting the operation of the law to motor vehicles, trailers and motor vehicle tires. Hence, we cannot say beyond a reasonable doubt that such distinction or classification is unreasonable, unjust or arbitrary. There are good and persuasive reasons why the Legislature may have seen fit to make a distinction between tires and other accessories or parts appertaining to motor vehicles. One of such reasons is that it is a common and frequent practice of thieves to steal motor vehicles, remove the tires therefrom, and then to sell, or attempt to sell, the stolen tires, after altering or destroying the original or manufacturer's serial numbers on the tires. The tires (with the exception of the engine) are the most costly parts of a motor vehicle, and are more easily removable, and, therefore, are more frequently the subject of larceny, than are other and less costly parts or accessories of a motor vehicle. ''A State may classify with reference to the evil to be prevented, and if the class discriminated against is or reasonably might be considered to define those from whom the evil mainly is to be feared, it properly may be picked out. . . . The State 'may direct its law against what it deems the evil as it actually exists, without covering the whole field of possible abuses.' '' [Patsone v. Pennsylvania, 232 U. S. 138, 1. c. 144; Cooley on Constitutional Limitations

(8 Ed.), p. 813.] In upholding the constitutionality and validity of the Illinois Motor Vehicle Law, as against the contention that such law is arbitrary and unreasonable by reason of discrimination and classification, the Supreme Court of that State has recently said, in People v. Billardello, 319 Ill. 124, l. c. 126: "It is the function of the Legislature to determine whether an evil exists which requires legislative action as well as what means should be adopted to suppress the evil, and its action will not be interfered with unless clearly in violation of some constitutional limitation."

Doubtless the Legislature of our State deemed the larceny of motor vehicle tires to be more prevalent than that of other motor vehicle parts and accessories; wherefore, the Legislature directed the law against the more prevalent evil as the one mainly to be feared and prevented. Such discrimination and classification is reasonable and proper, and does not constitute special or class legislation within the inhibition of Section 53, Article IV, of our State Constitution. [Humes v. Railway Co., 82 Mo. 221, 231; State v. Gritzner, 134 Mo. 512, 528; State v. Whitaker, 160 Mo. 59, 70; Blind v. Brockman, 321 Mo. 158, 12 S. W. (2d) 742, 745.]

III. Respondents strenuously insist that Subsection (d) of Section 25 of the Motor Vehicle Act is violative of Section 11, Article II, of our State Constitution, which provides: "That the people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures; and no warrant to search any place, or seize any person or thing, shall issue without describing the place to be searched, or the person or thing to be seized, as nearly as may be; nor without probable cause, supported by oath or affirmation reduced to writing." Subsection (d) of Section 25 of the Motor Vehicle Act makes it "the duty of every sheriff, constable and police officer in this state *having knowledge* of a motor vehicle, trailer or motor vehicle tire, the number of which has been removed, covered, altered, destroyed or defaced, and for which no special number has been issued, to immediately seize, take possession of such motor vehicle, trailer or motor vehicle tire, arrest the supposed owner or custodian thereof, and cause prosecution to be begun in a court of competent jurisdiction," etc. [Italics ours.]

Respondents cite Lowry v. Rainwater, 70 Mo. 152, and State v. Owens, 302 Mo. 348, as supporting their contention that Section 25, Subsection (d), of the Motor Vehicle Act is violative of the constitutional guaranty against unreasonable searches and seizures. In the Lowry case, supra, the statute there under consideration, and which was held to be violative of said constitutional guaranty, authorized an officer of police, having knowledge or *"satisfactory information"* that there is any prohibited gaming table, or other gaming device, kept within his district, to cause the same to be seized and destroyed.

The ruling of the unconstitutionality of such statute was predicated upon the specific ground that the statute made no provision for a judicial hearing and determination of the question whether the property seized by the police officer was the kind of property, and was being used for the purposes, condemned by the statute. In State v. Owens, supra, the precise question ruled by this court was whether whiskey, found in the possession of the defendant upon a search of his person made prior to his arrest, was properly admissible in evidence in a prosecution of defendant for violation of a statute prohibiting the possession of intoxicating liquors, the defendant having been first searched, and thereafter arrested, by the police officer without warrant or process of any kind. Neither of the cases cited by respondents dealt with a statute which is similar in terms and provisions to the Motor Vehicle Act here in question. The cited cases, therefore, furnish us no aid or precedent in the determination of the question at hand, whether Subsection (d) of Section 25 of the Motor Vehicle Act is violative of the constitutional guaranty against unreasonable searches and seizures.

The said subsection of the Motor Vehicle Act authorizes the seizure of a motor vehicle, trailer or motor vehicle tire only when the police officer has *knowledge* that the original or manufacturer's number of such motor vehicle, trailer or motor vehicle tire has been removed, covered, altered, destroyed or defaced, and the arrest of the person having custody of the inhibited property seemingly is to be made by the police officer concurrently with the seizure of the property. The act makes no provision for any search. The act, however, does provide for the prosecution, in a court of competent jurisdiction, of the person arrested, and at least impliedly provides for a judicial hearing and determination of the question whether the property seized by the police officer comes within the condemnation of the act. The evidence in the instant case indisputably discloses that the sale of a motor vehicle tire inhibited by Section 25 of the Motor Vehicle Act was made in the presence and *knowledge* of the police officer, and that the arrest of the person who offered such tire for sale, and who was the custodian of such tire, was made at the time the tire was sold, and by the police officer in whose presence the inhibited sale was made, and that the other tires which were seized by the police officer were those from which the original or manufacturer's numbers had been removed or destroyed, as inhibited by the act, which tires were not concealed or hidden from view so as to be discoverable only by a search of respondents' premises, but which tires were openly exposed, displayed, and exhibited for sale to the buying public in respondents' store or salesroom.

The Fourth Amendment to the Federal Constitution is almost identical in language with Section 11, Article II, of the Constitution of this State; hence, the construction and application given to the Fourth

Amendment to the Federal Constitution by the Supreme Court of the United States is strongly persuasive in the construction and application of a like section of our State Constitution. [State v. Owens, 302 Mo. l. c. 357.]

In Carroll v. United States, 267 U. S. 132, a section of the National Prohibition Act (U. S. C., Title 27, Section 40), enacted in aid of the enforcement of the Eighteenth Amendment to the Federal Constitution, was claimed to be violative of the Fourth Amendment. The section of the act there in controversy is closely similar in language and purport to the section of the Motor Vehicle Act under review herein, and provides: "When . . . any officer of the law shall discover any person in the act of transporting in violation of the law, intoxicating liquors in any wagon, buggy, automobile, water or air craft, or other vehicle, it shall be his duty to seize any and all intoxicating liquors found therein being transported contrary to law. Whenever intoxicating liquors transported or possessed illegally shall be seized by an officer, he shall take possession of the vehicle and team or automobile, boat, air or water craft, or any other conveyance, and shall arrest any person in charge thereof." Said section further provides that such officer shall at once proceed against the person arrested in a court of competent jurisdiction, and the court, upon conviction of the person so arrested, shall order the liquor destroyed, and, except for good cause shown, shall order a sale by public auction of the other property seized. The said section of the Federal act in controversy was held not to be violative of the guaranties of the Fourth Amendment to the Federal Constitution against unreasonable searches and seizures. Said a majority of the United States Supreme Court, speaking through Mr. Chief Justice TAFT (267 U. S. l. c. 149): "On reason and authority the true rule is that if the search and seizure without a warrant are made upon probable cause, that is, upon a belief, reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction, the search and seizure are valid. The Fourth Amendment is to be construed in the light of what was deemed an unreasonable search and seizure when it was adopted, and in a manner which will conserve public interests as well as the interests and rights of individual citizens."

In State v. Miller, 121 Wash. 153, l. c. 154, the Supreme Court of Washington, speaking to the contention that the seizure by police officers of an automobile truck, containing a quantity of whiskey, invaded the constitutional guaranties against unreasonable searches and seizures, has said: "The constitutional provisions invoked by the appellant do not prohibit a seizure without a warrant where there is no need of a search and where contraband subject-matter or unlawful possession of it is fully disclosed and open to the eye and hand."

In State v. Byrd, 72 S. C. 104, 109, it is said: "Under Section 16 of Article I of the State Constitution, which protects the citizen from unreasonable seizure of his person and property, there is no doubt a limit to the power of the General Assembly to authorize arrest of the citizen without warrant, but we do not think that limit has been reached when an officer is required to arrest without warrant one whom he discovers in the act of violating the criminal law. A full discussion of the authorities on this subject will be found in Burroughs v. Eastmen, 24 L. R. A. 859 (Mich.)."

In State v. Quinn, 111 S. C. 174, 180, a statute of South Carolina, providing that "it shall be the duty of rural policemen . . . to prosecute all persons for violation of the criminal law of every kind, making arrests upon their own initiation, as well as upon complaint or information, and to seize without warrant, and hold, all alcoholic liquors in possession of any person for unlawful use," was urged to be violative of Section 16, Article I, of the Constitution of that state, which (in language almost identical with our Missouri Constitution) provides that "the right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated, and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or thing to be seized." Speaking to the constitutionality of the statute therein attacked, the Supreme Court of South Carolina said: "The Constitution prohibits absolutely unreasonable searches, and it prohibits any search save upon a warrant duly issued. It requires a warrant to seize only in those instances where the seizure is assisted by a necessary search. It does not prohibit a seizure without warrant where there is no need of a search, and where the contraband subject-matter is fully disclosed and open to the eye and hand. [Art. I, sec. 16.]"

In Manning v. Roberts, 179 Ky. 550, 554, the defendant Roberts, a game warden, found the plaintiff Manning hunting, and saw the feathers and legs of wild birds sticking out of the saddle bags in the possession of Manning. Roberts demanded that Manning exhibit the statutory license authorizing him to hunt, and when the license of Manning was not exhibited, Roberts thereupon seized and took possession of the saddle bags, opened the same, and counted the birds therein. Manning sued Roberts to recover damages for an alleged assault and trespass, claiming that the section of the Kentucky Game Act, authorizing game wardens "to arrest on sight and without warrant any person detected by them in the act of violating such law, and . . . to seize, without process, any birds or game found in the possession" of any violator of the act, together with the dogs, guns and other instrumentalities used by the offender, is violative of Section 10 of the Bill of Rights of the Kentucky Constitution, inhibiting unreasonable searches and seizures. Said the Court of Ap-

peals of Kentucky, in upholding defendant Roberts' acts and conduct in the premises: "The case, in so far as Roberts' liability is concerned, comes to this: He as a game warden found appellant violating the law in hunting without a license, and having quail in his possession. That fact gave him the right, under Subsection 13 of the act, to seize the birds and carry them before a magistrate for trial and condemnation. Consequently in seizing the quail, Roberts did no more than the statute expressly authorized; and it was not an unreasonable seizure denounced by Section 10 of the Kentucky Bill of Rights."

In the light of the afore-cited juristic authorities bearing upon the question, we are of the opinion that Subsection (d) of Section 25 of the Motor Vehicle Act, which makes it the duty of a police officer in this State to seize and take possession of a motor vehicle, trailer or motor vehicle tire, and to arrest the custodian thereof, when such police officer has *knowledge* that the original or manufacturer's number on such motor vehicle, trailer or motor vehicle tire has been removed, covered, altered, destroyed or defaced, does not violate the constitutional guaranty against unreasonable searches and seizures secured by Section 11, Article II, of our State Constitution.

IV. It is claimed by the respondents that the provisions of Section 25 of the Motor Vehicle Act have no reasonable or legitimate relation to the police power of the State; that there is no real or substantial connection between the assumed purpose of the enactment and the actual provisions thereof; and that the said section of the act, at least in so far as the same purports to be applicable to motor vehicle tires, transcends the limits of the police power of the State, and should be declared invalid for the reason that it places an unreasonable and arbitrary regulation upon the possession and sale of a legitimate subject of commerce.

Similar statutes, enacted in other and foreign jurisdictions, uniformly have been held to be valid as a legitimate and reasonable exercise of the police power. In People v. Fernow, 286 Ill. 627, 629, the validity of a section of the Motor Vehicle Act of Illinois (which section makes it a misdemeanor for any person to have in his possession any motor vehicle from which the manufacturer's serial number, or any other trade or distinguishing number, or identification mark, has been removed, defaced, covered or destroyed) was challenged upon the ground that such legislation is an arbitrary and unreasonable exercise of the police power. Said the Supreme Court of that state, in sustaining the validity and constitutionality of the challenged enactment: "The purpose of the act is to prevent the defacing, covering or destruction of the manufacturer's serial number or distinguishing mark, so as to preserve the identity of motor vehicles and thereby protect the public against violations of law. The motor vehicle has

become the most common and efficient agency for the commission of crime and the chief instrumentality employed by criminals to avoid detection and escape punishment, and one of the methods employed is to destroy the evidence of identity. Motor vehicles have also become very frequent subjects of larceny, and the removal or change of the serial number is a convenient method for preventing identification and recovery. One committing a crime, even the most serious, and escaping in an automobile, would be more difficult of apprehension if the serial number or identification mark should be removed. The section is a legitimate and proper exercise of the police power." The constitutionality of the Illinois Motor Vehicle Act has been reaffirmed, as being a reasonable and legitimate police regulation, in People v. Johnson, 288 Ill. 442, and People v. Billardello, 319 Ill. 124.

In Hall v. State, 171 Ark. 787, the appellant Hall was convicted of the crime of possessing an automobile tire upon which the serial number had been mutilated, in violation of a statute of that state which makes it "unlawful for any person, firm or corporation to have in its possession an automobile, *automobile tires,* or gasoline engine, the motor and serial numbers of which have been mutilated to the extent that same cannot be read." The Supreme Court of Arkansas sustained the conviction of the appellant Hall, and, in so doing, ruled in the opinion (l. c. 788) : "The section of the statute in question was passed in exercise of the police power of the State for the protection of the public." To like effect was the ruling of the same court in Ogburn v. State, 168 Ark. 396, wherein the appellant was convicted of the crime of possessing an automobile, the motor and serial number of which had been mutilated to the extent that the same could not be read.

In Brooks v. United States, 267 U. S. 432, 436, 45 S. C. R. 345, the constitutionality of the National Motor Vehicle Theft Act was attacked upon the ground that such enactment was not a reasonable exercise of the police power. Said the Federal Supreme Court, speaking through Mr. Chief Justice TAFT: "The objection to the act can not be sustained. Congress can certainly regulate interstate commerce to the extent of forbidding and punishing the use of such commerce as an agency to promote immorality, dishonesty, or the spread of any evil or harm to the people of other States from the state of origin. In doing this it is merely exercising the police power, for the benefit of the public, within the field of interstate commerce. [Gloucester Ferry Co. v. Pennsylvania, 114 U. S. 196.]"

Mr. Ernst Freund, in his standard text on the Police Power (1904), section 86, page 88, says: "The police power either represses directly crime or violation of peace attempted to be committed or in the course of commission, or it deals by restrictive measures with conditions which tend to favor the commission of crime, or to render its detection difficult." The author of the text proceeds, in section 93, page 94;

"Certain classes of business may be placed under special control because they furnish facilities for the commission of crimes or for their concealment. Crimes may to some extent be prevented by properly restricting the sale of weapons, poisons or explosives; and their detection may be facilitated by a strict supervision of these trades. The law may, therefore, forbid the sale of poisons except upon responsible prescriptions; and it may require the keeping of registers showing every sale of weapons, with the name of the purchaser. As stolen goods usually find their way into the hands of pawnbrokers or dealers in secondhand goods, these trades may be kept under control by the requirement of a license, by demanding reports and authorizing inspection. The prevention or detection of crime may also justify restraints upon transactions apart from regular trades. The great facility with which the theft of cotton in the seed may be concealed led the Legislature of North Carolina to make it a misdemeanor, first, to sell small quantities of such cotton between sunset and sunrise; then to make any such sale without writing and without docketing the receipt for the purchase price with the justice of the peace. The statute was upheld as a legitimate police regulation (citing, State v. Moore, 104 N. C. 714). Such regulations for the prevention of theft are to be found in the old Anglo-Saxon laws."

Respondents urge, however, that differentiation should be made between legislative enactments respecting motor vehicles and those respecting automobile tires. While respondents seemingly do not seriously question the right of the State, in exercise of the police power, to enact legislation regulating the ownership, possession and sale of a motor vehicle, as a legitimate subject of police regulation, because of the frequent use (or misuse) of such vehicle as an agency of crime, but they argue that an automobile tire, when unattached to a motor vehicle, cannot reasonably be deemed to be a proper subject of police regulation, inasmuch as (to quote respondent's argument) "we have not yet come to the point where one may escape from the scene of a crime on an automobile tire, or may use an automobile tire as a means for the commission of a crime." Automobile tires, however, are wholly useless articles unless and until they be attached to the vehicle as integral parts of which they are designed and intended to be used. When so attached, they are frequent subjects of larceny. While bearing the original or manufacturer's serial numbers, they serve as convenient means of identification and recovery, in cases of theft, of the motor vehicle to which they are attached, and as convenient means of apprehension and detection of automobile thieves; and, when the original or manufacturer's serial numbers on the tires are destroyed, altered or removed therefrom, such convenient means of identification is prevented and thwarted.

We are of opinion that Section 25 of the Motor Vehicle Act is a reasonable and legitimate exercise of the police power of the State,

and that the provisions and requirements of said section tend toward the accomplishment of the object and purpose for which the police power, may rightfully be exercised, namely, the general welfare of the people of the State.

V. It is urged that Section 25 of the Motor Vehicle Act is violative of Section 30, Article II, of the Missouri Constitution, which provides "that no person shall be deprived of life, liberty or property without due process of law," and of Section 1 of the Fourteenth Amendment to the Federal Constitution, which provides that "no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any State deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

As held in the preceding paragraph of this opinion, the requirements of Section 25 of the Motor Vehicle Act are fairly referable to the police power of the State, in that such requirements were enacted in aid of the prevention and detection of crime and in furtherance of the public welfare. The legislative enactment being well within the purview of the police power, it does not violate or contravene the provisions of Section 30, Article II, of our State Constitution, or of Section 1, Article 14, of the Amendments to the Federal Constitution. [Ex parte Roberts, 166 Mo. 207; Komen v. St. Louis (Mo. Sup.), 289 S. W. 838, 842; Blind v. Brockman, 321 Mo. 58, 12 S. W. (2d) 742; 746; Bellerive Investment Co. v. Kansas City, 321 Mo. 969, 13 S. W. (2d) 628, 634, and cases there cited.]

VI. It is contended that Section 25 of the Motor Vehicle Act is violative of Section 8, Article I, of the Federal Constitution, which grants to the Congress of the United States the exclusive power "to regulate commerce among the several states." Respondents cite Jewell Tea Co. v. City of Carthage, 257 Mo. 383, as supporting the contention that Section 25 of the act violates the commerce clause of the Federal Constitution. In the cited case, it appeared that orders for merchandise were taken in Missouri by a salesman for an Illinois corporation, and that the orders were mailed to Illinois, in which foreign state the merchandise ordered was separately wrapped in original packages, which separate and original packages were shipped from Illinois to the salesman in Missouri, and were delivered unopened by the salesman to the respective persons in Missouri who had ordered them. The evidence in the case at bar discloses that the inhibited automobile tires were manufactured in states other than Missouri, and were sold to respondent corporation, an independent retail dealer, and were shipped from those foreign states to the respondent corporation in St. Louis, Missouri, where

they were commingled with other tires and were exhibited for retail sale to prospective buyers. In other words, unlike the merchandise in the Jewell Tea Company case, supra, the character of the automobile tires as subjects of interstate commerce ceased upon their delivery to respondent corporation in St. Louis, and, when exhibited and offered for sale at retail to prospective buyers in Missouri at respondent's place of business in St. Louis, the automobile tires were then subjects of internal or intrastate commerce.

The weight of juristic authority is to the effect that, where the goods or articles of merchandise (which are made the subject of regulation by state enactment) are in the State at the time of sale, the sale of such goods or merchandise is not a transaction of interstate commerce, regardless of what prior transportation of the goods or articles of merchandise may have taken place. [12 C. J. 27.] ''The test which seems to determine whether the transaction is to be regarded as belonging to interstate or intrastate commerce is whether the property which is the subject-matter of the sale is within the jurisdiction of the State at the time the sale is made.'' [Roselle v. Commonwealth, 110 Va. 235, 238.]

In Mutual Film Corporation v. Ohio Industrial Comm., 236 U. S. 230, a statute of Ohio, providing for the censorship and regulation of motion picture films to be publicly exhibited and displayed in that State, was attacked upon the ground that such statute imposed an unlawful burden on interstate commerce, and therefore contravened Section 8, Article I, of the Federal Constitution. Said the Federal Supreme Court, in denying such contention (236 U. S. 1. c. 240): ''The censorship, therefore, is only of films intended for exhibition in Ohio, and we can immediately put to one side the contention that it imposes a burden on interstate commerce. It is true that according to the allegations of the bill some of the films of complainant are shipped from Detroit, Michigan, but they are distributed to exhibitors, purchasers, renters and lessors in Ohio, for exhibition in Ohio, and this determines the application of the statute. In other words, it is only films which are 'to be publicly exhibited and displayed in the State of Ohio' which are required to be examined and censored. It would be straining the doctrine of original packages to say that the films retain that form and composition even when unrolling and exhibiting to audiences, or, being ready for renting for the purpose of exhibition within the State, could not be disclosed to the state officers. If this be so, whatever the power of the State to prevent the exhibition of films not approved—and for the purpose of this contention we must assume the power is otherwise plenary—films brought from another State, and only because so brought, would be exempt from the power, and films made in the State would be subject to it. There must be some time when the films are subject to the law of the State, and necessarily when they are in the hands of the exchanges ready to be

rented to exhibitors or have passed to the latter, they are in consumption, and mingled as much as from their nature they can be with other property of the State.''

So, it was held in Public Utilities Comm. v. Landon, 249 U. S. 236, that, while the piping of natural gas from one state to another state, and its sale and delivery by the owner of the pipe line to independent local distributing companies, is interstate commerce, the retailing of the gas by local distributing companies to their customers is intrastate commerce; and, therefore, it was ruled that the regulation by a State of the rates chargeable by the local distributing companies has merely an indirect and incidental effect upon interstate commerce, and is not an unlawful burden imposed by the State upon interstate commerce within the purview of the commerce clause of the Federal Constitution.

In Myron Green Cafeterias Co. v. Kansas City, 293 Mo. 519, this Division of our court ruled that an ordinance of Kansas City, prohibiting the use, by gas consumers in said city, of gas pumps and other devices designed to increase the flow of natural gas into the premises of the consumers, was not invalid as an interference with interstate commerce, in violation of Section 8, of Article I, of the Federal Constitution, although the natural gas was transported by a pipe line corporation from a foreign state to Missouri, where it was delivered to a local distributing corporation, the pipe line corporation receiving, as its share, two-thirds of the amount paid to the distributing corporation by local consumers for the gas delivered at consumers' premises.

It is clear to our minds that Section 25 of the Motor Vehicle Act applies, and was intended by the Legislature to apply, only to subjects of internal or intrastate commerce, and hence the regulatory provisions of said section cannot be deemed to impose a burden or restriction upon interstate commerce, or to violate the commerce clause of the Federal Constitution. [Hygrade Provision Co. v. Sherman, 266 U. S. 497, l. c. 503.]

VII. Lastly, it is claimed by respondents that the terms and requirements of Subsection (b) of Section 25 of the Motor Vehicle Act are so vague and indefinite as to be meaningless; that said subsection does not establish any common standard of guilt, but leaves such standard of guilt to the variant views of the various officers, judicial and administrative, who may be required to enforce the act, and therefore said subsection must be held unconstitutional and void, within the rule announced by the Supreme Court of the United States in United States v. Cohen Grocery Co., 255 U. S. 81, and Connally v. General Construction Co., 269 U. S. 385. The rule contended for by respondents is thus stated by Mr. Justice SUTHERLAND in the Connally case

(269 U. S. 1. c. 391) : "That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties, is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law. And a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law. [International Harvester Co. v. Kentucky, 234 U. S. 216, 221; Collins v. Kentucky, 234 U. S. 634, 638.]"

The act here in question makes it a misdemeanor for any person to sell, or to offer for sale, or to own, or to have the custody or possession of, a motor vehicle, trailer, or motor vehicle tire on which the "original or manufacturer's number or other distinguishing number" has been destroyed, removed, covered, altered or defaced. Respondents concede that the terms "original number," "manufacturer's number," and "distinguishing number" are used in the act synonymously. Respondents say in their brief and argument: "It is common knowledge, and accordingly this court will take judicial notice of the fact, that the manufacturer's number on an automobile *is* a *distinguishing* number. It is equally true, however, and is established without contradiction by the evidence in this cause, that the manufacturer's number on an automobile tire is *not* a *distinguishing* number. It is, therefore, left to the whim and caprice of every police officer, and every justice of the peace, of this State, to decide what is meant by the Legislature with respect to this expression 'distinguishing number.' This clearly leaves us without any common standard of guilt, and the law in question should, therefore, be held invalid on that point."

We are unable to follow respondents in the foregoing argument. The testimony of respondents' witnesses, given on the trial of this cause, indisputably establishes the fact that "a serial number is put on all tires as a part of the process of manufacturing, and all tires come out of the molds with serial numbers;" and, furthermore, that "individual tires are *distinguished* by the factory number and by the serial number." If (as respondents concede in their brief and argument) the manufacturer's original serial number, when put upon an automobile, *is* a *distinguishing* number, by what process of reasoning can it be maintained that the manufacturer's original serial number, when put upon an automobile tire, is *not* a *distinguishing* number? The manufacturer's original serial number is just as efficient as a means of identification whether put upon an automobile, or whether put upon an automobile tire. In either case, the manufacturer's serial number is one that *distinguishes* (i. e., identifies) the individual article or thing upon which such number is affixed from other individual articles or things of the same kind and class of manufacture.

The evidence herein discloses beyond any question that the various manufacturers of motor vehicle tires uniformly mold each tire with a serial number thereon, and that retailers and users of motor vehicle tires are cognizant of such trade custom. The evidence in the instant cause fairly warrants the conclusion that the term ''original or manufacturer's number or other distinguishing number,'' as used in the act, has a meaning well known to, and understood by, both sellers and users of motor vehicle tires, and therefore the terms and provisions of Subsection (b) of Section 25 of the act are not so vague and indefinite as to be deemed and held incapable of application, or as failing to establish an ascertainable and common standard of guilt. [Omaechevarria v. State of Idaho, 246 U. S. 343, l. c. 348; Hygrade Provision Co. v. Sherman, 266 U. S. 497, l. c. 502.]

VIII. It is argued by respondents that, if Section 25 of the Motor Vehicle Act shall be held to be valid and constitutional, the effect of such holding will be to render valueless many automobile tires in this State from which the original or manufacturer's serial numbers have been removed for the purpose only of classifying and distinguishing such tires as ''seconds,'' and that the effect of such holding will be to deprive the citizens of this State of the right and privilege of purchasing automobile tires known and classified as ''seconds.'' If, as respondents claim, the only purpose of removing or destroying the manufacturer's serial number on a motor vehicle tire is to conveniently indicate and distinguish such tire as a ''second,'' that purpose can be accomplished as well by branding or otherwise marking the tire with the word ''second,'' or with any other distinguishing mark, leaving intact the original or manufacturer's serial number upon the tire. However, the mere fact that the enforcement of a law, enacted by the Legislature in pursuance of the police power of the State, may result in some expense or inconvenience to those persons who come within its terms does not render such a law unconstitutional and invalid, or justify the courts in nullifying the law. The propriety, wisdom and expediency of legislation enacted in pursuance of the police power is exclusively a matter for the Legislature. The single question which lies within the province of the judiciary for its determination is whether the Legislature, in the exercise of the police power, has exceeded the limits imposed by the Constitution, Federal or State. [6 R. C. L. 107, 108; Blind v. Brockman, 321 Mo. 58, 12 S. W. (2d) 742, 747; Bellerive Investment Co. v. Kansas City, 321 Mo. 969, 13 S. W. (2d) 628, 640; Atkin v. State of Kansas, 191 U. S. 207, 24 S. C. R. 124.] We are of opinion that the terms and provisions of Section 25 of the act under consideration do not contravene those sections of the State and Federal Constitutions which respondents claim to

have been violated, and therefore the validity and constitutionality of Section 25 of the Motor Vehicle Act must be upheld and declared.

It follows that the judgment of the trial court must be reversed, and that the cause should be remanded to the circuit court with directions to dismiss the plaintiffs' petition for want of equity. It is so ordered. *Lindsay* and *Ellison, CC.,* concur.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur.