No. 41,304

STATE OF KANSAS, ex rel. JOHN ANDERSON, JR., Attorney General of the State of Kansas, *Appellant*, v. THE FLEMING COMPANY, INC.; BEATRICE FOODS COMPANY; FOREMOST FOOD AND CHEMICAL COMPANY; ADAMS DAIRY COMPANY; FAIRMONT FOODS COMPANY; and EDWARD G. JOHNSTON, *Appellees*.

(339 P. 2d 12)

Opinion filed May 16, 1959.

*George B. Powers* and *Gerald Sawatzky,* special assistant attorneys general, both of Wichita, argued the cause, and *John Anderson, Jr.,* attorney general, and *Charles N. Henson, Jr.,* assistant attorney general, were with them on the briefs for the appellant.

*John J. Hasburgh, Jr.,* of Kansas City, Missouri, argued the cause, and *James W. Porter,* of Topeka, *Melvin J. Spencer* and *Robert I. Donnellan,* both of Kansas City, Missouri, were with him on the briefs for the appellee Adams Dairy Company.

*Charles F. Lamkin, Jr.,* of Kansas City, Missouri, argued the cause, and *Lester M. Goodell,* of Topeka, and *Norman E. Greene,* of Kansas City, Missouri, were with him on the brief for the appellee Foremost Food and Chemical Company.

*Jacob A. Dickinson,* of Topeka, *Roy P. Swanson* and *Robert M. Duboc,* both of Kansas City, Missouri, and *E. R. Schaberg,* of Omaha, Nebraska, of counsel, were on the brief for the appellee Fairmount Foods Company.

*Robert L. Webb, Ralph W. Oman, Robert A. McClure, Philip E. Buzick,* and *James D. Waugh,* all of Topeka, were on the brief for the appellee The Fleming Company, Inc.

*Clayton E. Kline, M. F. Cosgrove, Robert E. Russell, Willard N. Van Slyck, Jr., William B. McElhenny, O. R. Stites, Jr.,* and *James L. Grimes, Jr.,* all of Topeka, were on the brief for the appellee Beatrice Foods Company.

*W. A. Kahrs,* of Wichita, for Kansas Ice Cream and Milk Institute, Steffens Dairy Foods Company, Inc., Hyde Park Dairies, Inc., and Armstrong Creamery Company, as *amicus curiae.*

*Richard L. Becker* and *Morris D. Hildreth,* both of Coffeyville, for Bennett Ice Cream Company, Gardiner Dairy and Ice Cream Company, Hoch Dairy, Lawrence Sanitary Milk and Ice Cream Company, Inc., and The Page Milk Company, as *amici curiae.*

The opinion of the court was delivered by

JACKSON, J.: This is an appeal involving an injunction suit brought by the attorney general under the provisions of G. S. 1957 Supp., Chapter 50, Article 5, against the defendant-appellees. The aforementioned article 5 constitutes the provisions of Laws of

1957, Chapter 309, in which the legislature attempted to make a number of things unlawful when done by a distributor, processor, or wholesaler of dairy products. In a certain sense, the act is an unfair trade practice act (cf. G. S. 1949, ch. 50, art. 4) dealing only with dairy products and the sale thereof. The district court held the new act entirely unconstitutional and the plaintiff has appealed.

In the suit below, appellant filed his petition against the appellees alleging that each of them had violated the provisions of G. S. 1957 Supp. 50-503 (l) and (m). Without detailing the amendments of the petition, it will be sufficient to state that certain defendants named in the original petition who were retailers were dropped from the pleading, and we are now concerned with the second amended petition. This pleading charges that all of the appellees sold milk to certain grocery stores at fourteen and one-half cents per half gallon and in the case of Adams Dairy Company at the price of thirteen and one-half cents per half gallon; that such conduct constituted a violation of the statute and appellant sought an injunction against the appellees (see section 50-505). The appellees demurred to the second amended petition and after due consideration by the trial court, the demurrers were sustained on the ground that the statute was unconstitutional.

Other matters in the trial court need not be noted here and we shall proceed to consider the constitutionality of the new act attempting to regulate the dairy industry.

It will be noted first that the act begins in section 50-501 with a statement that certain practices are current in the dairy industry and adversely affect the stable economy of the state. This section constitutes a statement of the purposes of the act and reads as follows:

"The practices being conducted by many dairy processors, wholesalers, and distributors in Kansas of selling below cost and in the subsidization of retail dealers through secret discounts, gifts, loans and other means and the furnishing of equipment, adversely affect the stable economy of Kansas. Such trade conduct causes unfair price discrimination, destructive and predatory trade practices, tends to reduce the price paid to the dairy farmer, increases the price paid by the consumer, and misleads the public as to the true value of dairy products, and is detrimental to the public health and welfare."

Section 50-502 of the act contains definitions. The most important in this case are the definitions of "distributor," "processor," and "wholesaler." It may be noted in passing that under these definitions, a dairyman owning a herd of milk cows and a pasteur-

izing plant and delivering most of his milk to his own customers at their homes would still fall within the terms "distributor," "processor," and "wholesaler" if he at the same time sold some of his milk to the corner grocery store for resale. The court takes notice that there are some such dairies even in Shawnee County.

In section 50-503, the first paragraph reads as follows:

"It shall be unlawful for any person engaged in business as a wholesaler, processor, or distributor, individually or through or by affiliates, subsidiaries, associates, agents or stockholders, directly or indirectly, to do or cause to be done any of the following acts:"

Following this are enumerated a great number of prohibited acts, most of which seem to forbid the granting of concessions to retailers. Only the two subparagraphs hereinafter set out are involved in this suit and they read as follows:

"($l$) Sell any products, unit or combination thereof, for less than cost to the wholesaler, processor or distributor at the point of delivery; or sell to any retail dealer any expendable supplies for less than cost to any such wholesaler, processor or distributor at the point of delivery plus a markup of six percent (6%) of such cost as a proportionate share of the cost of doing business; except a person may sell either such dairy products or expendable supplies at prices made in good faith to meet existing lawful competition. Competent evidence of the prevailing cost to other such wholesalers, processors, or distributors engaged in selling dairy products on the same market shall constitute prima facie evidence of the cost to any person charged with violation of this provision.

"($m$) Grant, either directly or indirectly, to any retail dealer any secret discount, make any rebate, or permit any deviation from the price at which he furnishes dairy products of the same quality, brand and quantity to other retail dealers in the same city, unincorporated town, or immediate vicinity thereof, except that deviations from such prices may be given when made in good faith to meet existing lawful competition: *Provided, however,* That bids, deviating from such prices, made pursuant to invitations issued by federal institutions or installations, may be filled, and contracts entered into, and fulfilled, without being deemed in violation of the provisions of this subsection. The terms 'made in good faith' and 'lawful' as used in this and the preceding subsection shall mean 'in conformity with and not in conflict with nor contrary to, any law of this state or of the United States of America.'"

We need not refer to the other sections of the statute at this time.

In the lower court and here, the appellees contend that the statute under consideration is unconstitutional under the Fourteenth Amendment to the Constitution of the United States and Sections 1, 10 and 18 of the Bill of Rights of the Constitution of Kansas. The trial court in the finding that the above quoted sec-

tions were unconstitutional seems to have held that the legislature would patently not have enacted the statute without those sections and that therefore, the entire statute was unconstitutional.

It must be established beyond question that the legislature has power to regulate and provide for the accomplishment of the purposes set forth in section 50-501. Not only have monopolies and trusts been the subject of legislation for more than half a century, but the dairy industry has been regulated for the purpose of protecting the public health and welfare more completely than any other industry. We shall not pause to cite cases upon this proposition. The real question here, we believe, comes down to the matter well stated by the Supreme Court of the United States in the case of *Nebbia v. New York*, 291 U. S. 502, 78 L. Ed., 940, 54 S. Ct. 505, 89 A. L. R. 1469, in which the court said:

"The Fifth Amendment, in the field of federal activity, and the Fourteenth, as respects State action, do not prohibit governmental regulation for the public welfare. *They merely condition the exertion of the admitted power, by securing that the end shall be accomplished by methods consistent with due process.* And the guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained. It results that a regulation valid for one sort of business, or in given circumstances, may be invalid for another sort, or for the same business under other circumstances, because the reasonableness of each regulation depends upon the relevant facts." (p. 525.) (Italics supplied.)

The appellant seems to place considerable emphasis on the Nebbia case, but as said by the Supreme Court of the United States, each case must depend upon its own relevant facts. While the Nebbia case is an important case, the facts there were that the state of New York set up a complete regulation of the dairy industry during a time of crisis. The industry was placed under the regulation of an administrative body which had the power to fix both minimum and maximum prices and regulate the industry in other ways. The purposes of the act were to protect the public health, insure the supply of milk and encourage its production and possibly to prevent monopoly. Objections could be made to the administrative authority from which appeal to the courts could be made by *certiorari*. We are told that many states after the decision of the Nebbia case enacted laws establishing similar regulations. Be that as it may, it must be agreed that decisions concerning such statutes are not in point in the present case.

Counsel advise that although similar acts to the one now before

the court have been enacted in other states, no judicial consideration of them has been found, and our independent search has likewise been unavailing.

Nearest to the present type of statute are the general unfair practice acts of the various states. The Kansas act appearing as G. S. 1949, Chapter 50, Article 4, has been recently under consideration in this court. (See *State v. Consumers Warehouse Market*, 183 Kan. 502, 329 P. 2d 638.)

The appellees attack the application of the dairy act on three principal grounds. First, that no criminal intent is required under the statute, but that the sale of any dairy products for less than cost to the wholesaler, processor or distributor is made to constitute a criminal act. Second, that no definition of "cost at the point of delivery" is contained in the act. They also point out the exception providing "a person may sell either such dairy products or expendable supplies at prices made in good faith to meet existing *lawful* competition." We shall dispose of these questions before taking up any other matters in the appeal.

In starting this discussion, it may be noted that as the appellant in effect states, the act under consideration is no model of the scrivener's art. However, appellant points to the fact that certain acts may be made criminal without including the element of *mens rea*. The following cases are cited to substantiate that position: *State v. Beam*, 175 Kan. 814, 267 P. 2d 509 (giving a worthless check); *State v. Merrifield*, 180 Kan. 267, 303 P. 2d 155 (driving without a license); and the cases cited in the opinions.

The case of *May's Drug Stores v. State Tax Comm.*, 242 Iowa 319, 45 N. W. 2d 245, is cited as showing a decision by the Supreme Court of Iowa upholding a statute making illegal the sale of cigarettes at less than cost by a wholesaler or retailer. In the Iowa statute, it seems no criminal intent was required.

The appellees point out that most of the general unfair practice acts contain provisions requiring a criminal intent and that those which do not, have been usually held to be invalid. In *State v. Consumers Warehouse Market*, supra, this court at page 511 took pains to stress that our act required that the sale below cost be made with the intent to unfairly divert trade and otherwise injure a competitor, and see *State v. Packard-Bamberger & Co., Inc.*, 123 N. J. L. 180, 8 A. 2d 291; *Commonwealth, Appellant, v. Zasloff*, 338 Pa. 457, 13 A. 2d 67, 128 A. L. R. 1120.

A pertinent case is *Fairmont Co. v. Minnesota,* 274 U. S. 1, 47 S. Ct. 506, 71 L. Ed. 893, 52 A. L. R. 163. This case involved a statute forbidding, under penalty, creameries to purchase cream at higher prices in one locality than in other localities, after allowance for the difference in cost of transportation. The Supreme Court of the United States reversed the holding of the Supreme Court of Minnesota and held that the statute was unconstitutional as denying due process of law because the statute made illegal an otherwise lawful act without the necessity of a criminal intent. The court said:

"It seems plain enough that the real evil supposed to threaten the cream business was payment of excessive prices by powerful buyers for the purpose of destroying competition. To prevent this the statute undertook to require every buyer to adhere to a uniform price fixed by a single transaction.

"As the inhibition of the statute applies irrespective of motive, we have an obvious attempt to destroy plaintiff in error's liberty to enter into normal contracts long regarded not only as essential to the freedom of trade and commerce, but also as beneficial to the public. Buyers in competitive markets must accommodate their bids to prices offered by others, and the payment of different prices at different places is the ordinary consequences. Enforcement of the statute would amount to fixing the price at which plaintiff in error may buy, since one purchase would establish this for all points without regard to ordinary trade conditions.

"The real question comes to this: May the state, in order to prevent some strong buyers of cream from doing things which may tend to monopoly, inhibit plaintiff in error from carrying on its business in the usual way heretofore regarded as both moral and beneficial to the public and not shown now to be accompanied by evil results as ordinary incidents? Former decisions here require a negative answer. We think the inhibition of the statute has no reasonable relation to the anticipated evil—high bidding by some with purpose to monopolize or destroy competition. Looking through form to substance, it clearly and unmistakably infringes private rights whose exercise does not ordinarily produce evil consequences, but the reverse."

That the element of intent was thought to be most important may be seen from the fact that the court had previously held constitutional a statute of South Dakota which forbade discrimination in the price of goods in different localities *for the purpose* of destroying competition and the creation of a monopoly. (See *Central Lumber Co. v. South Dakota,* 226 U. S. 157, 57 L. Ed. 164, 33 S. Ct. 66.) It may be noted that the Central Lumber Co. case is cited in a footnote in the Nebbia case and there is nothing to indicate that the Nebbia case overruled or made obsolete the Fairmont case. Before giving a final answer to this question of an intent in the

statute, we would like to turn to the question of the definition of cost.

It will be seen that no attempt is made to define cost in the statute. It only states a wholesaler, processor or distributor must not sell products "for less than cost . . . at the point of delivery." It is argued that in this day and age, everyone in business has the services of accountants, but it will be seen that the statute leaves unanswered the question of whether the cost is to be determined as of a particular shipment or based upon business for a week, a month, six months or a year. The statute is totally silent as to what expenses are to be included in arriving at the cost at the point of delivery.

The appellant would read the statute to simply provide that the appellees should keep books in good faith. But we cannot feel that the interpretation of the statute is so simple. In *Dikeou v. Food Ass'n*, 107 Colo. 38, 108 P. 2d 529, defendant was being prosecuted for selling cigarettes at $1.12 per carton, which was claimed to be below the cost to him as proscribed by the Colorado statute. Defendant's accountant testified that under his own breakdown of the business, defendant was realizing a profit of $.0062 on each sale at the stated price, and that the statute had not been violated. On the other hand, plaintiffs contended that defendant's costs were not as stated but amounted to $1.14 per carton. It must be remembered that this dispute arose under a statute which specified that a criminal intent must exist and that the manner of arriving at the cost of the seller was rather carefully defined. We are hardly as hopeful of the practical operation of a statute which requires no specific intent and makes no attempt to define the elements to be taken into consideration as to the cost to the seller.

Notice also the provisions at the close of subsection (*l*) in relation to evidence of prevailing costs of others engaged in selling dairy products. Attention is also directed to the holding of this court in *State v. Consumers Warehouse Market*, supra, at pages 511-512 in regard to G. S. 1949, 50-401 (*e*).

The objections made to the exception as to sales "made in good faith to meet existing lawful competition" were mentioned at the beginning of the opinion. The appellant in his petition alleges that none of the defendants was selling milk in good faith to meet existing lawful competition.

It is argued that one need not decide at his peril whether his

competitor's price is lawful. The great difficulty with the argument is the definitions of "good faith" and "lawful" as found in subsection (*m*) and made to apply to this very exception. Under a different statute such cases as *State, By Clark, v. Wolkoff*, 250 Minn. 504, 85 N. W. 2d 401, might be of considerable weight. The Minnesota statute, contrary to the statute now under consideration, required a criminal intent as an element of the crime proscribed. In *State, ex rel. v. Commercial Candy Co.*, 166 Kan. 432, 201 P. 2d 1034, this court in construing the general unfair practices act said:

"We are unable to find any evidence in this record upon which the trial court could base its conclusion of fact No. 13 and its conclusion of law No. 5, in which it found that the defendants did not make the sales in good faith and to meet the price of the Poehler company, their competitor, and that the sales in question were made below cost with the intent or effect of injuring competitors and destroying competition. It may be that the sales by the defendants resulted in injury to other competitors and tended to destroy competition, but by the very terms of the act (50-402) such sales must be made with the intent to bring about those results enumerated by the statute in order to constitute a violation of the act. The act (50-405) further provides that a wholesaler may sell for less than cost where the price of merchandise is made in good faith to meet the price of a competitor in the same locality.

"The trial court may have reached its conclusions on account of the fact the record shows that the defendants made no effort to ascertain whether or not the Poehler Company was selling below cost, and that, therefore, the defendants were guilty of bad faith and thus made the sales in question with the intent to bring about the results prohibited by the statute. However, we are of the opinion that this would be an erroneous and unreasonable construction of the burden of proof portion of the exemption provision. As a practical proposition, how could the defendants have ascertained whether or not the price of $1.59 per carton was below cost to the Poehler company unless resort be made to the books and records of such competitor?" (pp. 437-438.)

It must be evident that a criminal statute, which neither requires a criminal intent in doing the proscribed act or defines with exactness the act forbidden, and further is indefinite as to exceptions as to liability, must be considered to deny due process to one against whom the statute is asserted.

It is elemental that a criminal statute must be definite. (*State v. Ashton*, 175 Kan. 164, Syl. ¶ 1, 262 P. 2d 123.) Neither does the fact that this is a civil suit and not a criminal action help the statute enough to make it valid. We would read this statute as a whole.

In the May's Drug Stores case, *supra*, which is stressed by appellant, the Supreme Court of Iowa did find that in that case no

criminal intent was required by the statute, but it may be noted that the elements of the cost of the defendant were very accurately set out in the statute. The court said:

"The Act in question defines cost to a wholesaler or retailer as the 'basic cost of cigarettes' to the wholesaler or retailer plus his 'cost of doing business.' 'Basic cost' is either invoice or replacement cost, whichever is lower. And 'cost of doing business' is presumed to be four per cent of the basic cost of the cigarettes for a wholesaler and eight per cent of such cost for the retailer 'in the absence of proof of a lesser or higher cost.'" (p. 336.)

In the case of *Commonwealth, Appellant, v. Zasloff,* supra, no intent was required and no definition of the elements of the cost was provided, and the Supreme Court of Pennsylvania found the statute unconstitutional. Likewise, the New Jersey statute of similar import was declared invalid in *State v. Packard-Bamberger & Co., Inc.,* supra. We have pointed out that the Supreme Court of the United States in *Fairmont Co. v. Minnesota,* supra, held that the lack of a criminal purpose in doing the proscribed act made the statute under consideration invalid as a denial of due process. The Minnesota statute like the Kansas statute now under consideration dealt with dairy products, and had been passed for the same declared purpose.

From all of the foregoing, the court is convinced that the provisions of subsections (*l*) and (*m*) of section 50-503, G. S. 1957 Supp. deny due process of law to the appellees in violation of the provisions of the Fourteenth Amendment to the Constitution of the United States and of the Bill of Rights, § 18, of the constitution of Kansas.

The trial court issued an order holding the entire act of the legislature invalid although only the two subsections discussed and set out above were at issue in this case. Only sales of milk at a price below the appellees' cost at point of delivery were charged in the petition. The act contains a section specifying that the invalidity of any section shall not render the entire act invalid. Moreover, this court only considers constitutional questions when the complaining party is affected by the statute complained of. In *Marks v. Frantz,* 179 Kan. 638, 298 P. 2d 316, the court said:

"Before taking up appellant's contentions, we take note of established principles applicable where constitutionality of a statute is to be determined. Constitutionality of a statute is presumed, doubts as to constitutionality are resolved in favor of legality, and before the statute may be stricken down, it must clearly appear the statute offends. (See, *e. g., Carolene Products Co. v. Mohler,* 152 Kan. 2, 102 P. 2d 1044; *Board of County Comm'rs v. Robb,*

166 Kan. 122, 199 P. 2d 530; *State, ex rel., v. Board of Regents,* 167 Kan. 587, 207 P. 2d 373, and cases cited therein.) In determining constitutionality of a statute the court's duty is to uphold ·the legislation rather than defeat it and if there is any reasonable way to construe the legislation as constitutionally valid that should be done. (See *e. g., Mizer v. Kansas Bostwick Irrigation District,* 172 Kan. 157, 239 P. 2d 370.) It is further to be noted that constitutionality of legislation will be considered only where necessarily involved and such a determination required (See, *e. g., State, ex rel., v. School District,* 163 Kan. 650, 185 P. 2d 677, and that constitutionality may not be questioned by one not affected by its operation. (See, *e. q., Kansas Utilities Co. v. City of Burlington,* 141 Kan. 926, 931, 44 P. 2d 223; *Stone v. City of Wichita,* 145 Kan. 377, 65 P. 2d 595.) With respect to the last rule, it may be observed that under the complaint filed with the board, the appellant is charged with certain acts. Insofar as they are concerned he may question constitutionality of the statute involved—but under that rule he has no standing to attack the act as an entirety and respecting those phases of it which are not involved in the charges against him and by way of illustration we mention attendance at the educational programs as outlined in his petition." (p. 643.)

Certain other matters are mentioned in the briefs of some of the parties, but the court is of the opinion they require no notice in this opinion.

The order of the district court was too broad in holding all of Laws of 1957, Chapter 309 (G. S. 1957 Supp. 50-501, *et seq.*) invalid. The district court did not err in finding subsections (*l*) and (*m*) of section 50-503 denied due process to the appellees. As so modified, the order of the trial court should be affirmed. It is so ordered.