**FLEMING FOODS OF MISSOURI, INC., Respondent,**

v.

**John G. RUNYAN, Director, Missouri Department of Agriculture, and Missouri Department of Agriculture, Appellants.**

**No. 62685.**

Supreme Court of Missouri, En Banc.

June 8, 1982.

John Ashcroft, Atty. Gen., Gerald M. Sill, Asst. Atty. Gen., Wm. Clark Kelly, Jefferson City, for appellants.

Malcolm L. Robertson, Joplin, for respondent.

RENDLEN, Judge.

Respondent, Fleming Foods of Missouri, Inc. [Fleming] applied to the Director of the Missouri Department of Agriculture [Director] for license as a milk distributor, pursuant to the provisions of §§ 416.410 to 416.560, RSMo 1969. Following an evidentiary hearing the Director, on his findings of fact and conclusions of law, entered an order denying the application. Fleming sought judicial review as provided in § 536.100, RSMo 1969[1] and on November 26, 1979, the Circuit Court of Jasper County reversed the Director's order, holding "that the finding of the Director of Agriculture was not supported by competent and substantial evidence upon the whole record and is unauthorized by the law" and ordered the license issued. From that judgment the Director sought review in the Missouri Court of Appeals, Southern District, and following the recommendation of that court the cause was transferred here and is decided as though on original appeal. Mo.Const. Art. V, § 10.

In cases of this nature "we review the findings and decisions of the [Director] not the judgment of the trial court." *Mueller v. Ruddy*, 617 S.W.2d 466, 472 (Mo.App. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 600, 70 L.Ed.2d 590, and the scope of our

1. Authority for judicial review in such cases is found in § 416.490.4, RSMo 1969, which permits appeal in the manner provided "in the administrative procedure law of Missouri."

review is limited by § 536.140, RSMo 1978. We are to determine in the first instance if the Director's findings were supported by competent and substantial evidence on the record as a whole, *Stephen & Stephen Properties, Inc. v. State Tax Commission*, 499 S.W.2d 798, 802 (Mo.1973), and while not bound by the administrative body's decisions on questions of law, *Wolf v. Missouri State Training School for Boys*, 517 S.W.2d 138, 142 (Mo. banc 1974), we give due weight to the expertise and experience of the agency and its opportunity to observe the witnesses.

Resolution of the issues requires construction of § 416.440, RSMo 1969, a section of the Unfair Milk Sales Practices Act [Act] of 1959 now codified as §§ 416.410 to 416.560, RSMo 1978.[2] We are called on to ascertain the legislative intent, *City of Willow Springs v. Missouri State Librarian*, 596 S.W.2d 441, 445 (Mo.1980), and so doing, find assistance in earlier decisions of this Court. In *Borden Company v. Thomason*, 353 S.W.2d 735 (Mo. banc 1962), as in the case at bar, evidence was introduced[3] to show that pursuant to Senate Concurrent Resolution No. 19 of the Sixty-Ninth General Assembly, an interim committee was appointed with Senator Albert M. Spradling, Jr., of Cape Girardeau as Chairman to study the problem of production, processing, sale and distribution of milk in Missouri. The Committee's detailed report of January, 1959 to the Seventieth General Assembly, entitled "Final Report of the Joint Committee on Milk Producers and Distributors", led to adoption of the "Act". That report, in pertinent part, pointed out that: (as quoted in *Borden* at 741)

"There is no article of food in more general use than milk; none whose impurity and unwholesomeness may more quickly, more widely, and more seriously affect the health of those who use it. The regulation of its sale is an imperative duty that has been universally recognized. * * Between 1933 and 1936 twenty-seven states adopted milk price control legislation." The committee, however, submitted a milk sales regulation bill patterned after the Tennessee Act. "Dairy Law of the State of Tennessee," Chapter 3, Secs. 52.331 to 52.341. The committee's finding as to the situation existing in Missouri was as follows:

"Testimony received by the committee revealed the seriousness of a situation which has been only too evident in the corner grocery stores and supermarkets of our state during the past months. A series of destructive price wars has frightened and demoralized those of our

2. Section 416.440, RSMo 1969, provides:

1. No milk processor or distributor shall, with the intent or with the effect of unfairly diverting trade from a competitor, or of otherwise injuring a competitor, or of destroying competition, or of creating a monopoly, give or offer to give any milk product purchaser any rebate, discount, free service or services, advertising allowance, pay for advertising space used jointly, donation, free merchandise, rent on space used by the retailer for storing or displaying the milk processor's or distributor's merchandise, financial aid, free equipment, or any other thing of value; except the bona fide return by a cooperative association to its members on a patronage basis of the savings realized on products sold and distributed to the members or patrons.

2. Proof of the giving or offer to give anything of value is prima facie evidence of a violation of this section.

3. No milk product purchaser shall accept from any milk processor or distributor any rebate, discount, free service or services, any advertising allowance, pay for advertising space used jointly, donation, free merchandise, rent on space used by retailer for storing or displaying the milk processor's or distributor's merchandise, financial aid, free equipment, or any other thing of value; except the bona fide receipt from a cooperative association of a patronage refund based on the patronage of the purchaser with the cooperative association.

4. Proof of the acceptance of any thing of value by any milk product purchaser is prima facie evidence of the violation of this section.

5. This section does not prevent a processor or distributor from furnishing point-of-sale advertising material to a retailer without cost for the promotion of the sale of the processor's or distributor's products.

6. This section does not prevent a discount of two percent or less for payment on or before a certain date.

3. Fleming's Exhibit No. 1 is the "Final Report of the Joint Committee on Milk Producers and Distributors" of January, 1959.

citizens who fully understand the implications of such activities as well as those who depend for their livelihood upon the milk industry. Milk has sold for as little as eight cents per half gallon in some areas. In one town, the price of milk and other dairy products dropped so low that the farmers were able to purchase them to feed to their pigs.

"Of course, prices such as these are often greeted with enthusiasm by inflation-weary consumers, but the natural consequences thereof bode future difficulties for producers, distributors and consumers alike. *Price wars exert tremendous pressure on smaller distributors* who are without the resources to operate for extended periods of time when a loss is incurred on each sale. The price of much of the milk purchased from producers in Missouri is established under a federal order. Thus the distributor finds himself trapped between the contracting pincers of the stable price of the milk he buys and the ever lower price of the milk he sells. *Under such conditions small distributors disappear and large distributors expand until competition no longer controls prices and the buyer is left to the mercy of the seller.*" (Emphasis added).

The Court in *Borden* continued at 743: "that the dairy industry is subject to regulation and has been regulated so by the legislature for the public welfare for many years." In the case of *State of Kansas ex rel. Anderson v. Fleming Co.*, 184 Kan. 674, 339 P.2d 12, the court said the dairy industry had been regulated for the purpose of protecting the public health and welfare more completely than any other industry.

In the case of *H. P. Hood & Sons v. DuMond*, 336 U.S. 525, 69 S.Ct. 657, 660, 93 L.Ed. 865, the court said: "Production and distribution of milk are so intimately related to public health and welfare that the need for regulation to protect those interests has long been recognized and is, from a constitutional standpoint, hardly controversial. Also, the economy of the industry is so eccentric that economic controls have been found at once neces-

sary and *difficult.*" The police power extends to economic needs. (Emphasis added).

and further stated at 744:

Clearly there is a greater governmental interest in promoting and insuring fair competition in the milk industry by prohibiting sales below cost in that industry than in other industries, which fact accounts for the legislative attempt to remedy unfair competition and avoid the danger of monopoly in that industry. On the facts found by the interim committee the Legislature *could properly single out the milk industry* for a valid exercise of the police power of the State to remedy conditions found to exist in that industry. (Emphasis added).

Before proceeding further with respondent's contentions regarding the validity of the Act, we should say that it is apparent on the face of the Act that in passing it the Legislature was purporting to act under the police power of the State and that the Act is designed to prevent monopolies and unfair trade practices by competitors for the public good. "The propriety, wisdom, and expediency of legislation enacted in pursuance of the police power is exclusively a matter for the Legislature." *Star Square Auto Supply Co. v. Gerk*, 325 Mo. 968, 997, 30 S.W.2d 447, 462[14–16].

Summing up the general purposes of legislation controlling the fluid milk industry which includes both health and economic concerns, this Court in *Borden* at 745, citing *Nebbia v. People of State of New York*, 291 U.S. 502, 54 S.Ct. 505, 516, 78 L.Ed. 940 (1934), concluded that when the legislature within its sphere decides that the conditions or practices in an industry make unrestricted competition an inadequate safeguard of consumers' interest and a public need has been demonstrated that appropriate statutes passed to correct the threatened consequences, such statute will be enforced and not be set aside though the regulation fixes prices if "deemed by the Legislature to be fair to those engaged in the industry and to the consuming public. And this is especial-

ly so where, as here, the economic maladjustment is one of price, which threatens harm to the producer at one end of the series and the consumer at the other." *Id.* at 745. Rejecting various constitutional challenges to the Act the court in *Borden* held:

There is no valid ground for a strict construction of the Act against the State in this proceeding and we think it must be given a liberal construction in order that its beneficial purposes may be subserved. (l. c. 753)

adding at page 755:

The Missouri statute contains no criminal penalties and is not a criminal statute, and is not required to be strictly construed against the State.

In this regard it is worthy of note that Fleming, during the testimony of its expert witness Dr. Gary Devino, introduced as its Exhibit No. 31 an article Devino authored wherein he expressed his view of the legislative intent when adopting the Unfair Milk Sales Practices Act as follows:

The concern on the part of the legislature was that a continuation of the price wars would result in a *disappearance* of *small distributors*, and the development of monopolies *by large distributors.* (Emphasis added).

From the language of the Act and with these insights to the legislative intent we have examined the record to determine if the findings and conclusions of the Director were supported by competent substantial evidence and authorized by law.

Fleming Foods of Missouri, Inc., respondent herein, is a wholesale food distributor and franchisor of IGA retail grocery stores in a 16 county area of southwest Missouri, the northwest and northeast portions of Arkansas and Oklahoma respectively, and a part of southeast Kansas. It distributes wholesale groceries and supplies only to IGA retailers who have entered into a trademark license agreement with respondent. There are 96 such retail franchisees in the four state area, 23 of whom are Missouri retail grocers. Each of the franchisee-grocers enters into a sales-service plan agreement with respondent's parent company, Fleming Foods, Co., of Topeka, Kansas. By the terms of those agreements each retailer is entitled to services provided by respondent, the cost of which is computed under a fee schedule keyed to percentage purchases from respondent during a four-week accounting period. Although a retailer may refuse all services, he still must pay his service fee based on a volume discount which ranges from 4 percent, if the retailer's purchases from Fleming are less than $5,000 during a four-week period, to 2.15 percent, if such purchases reach $100,000.

Fleming called as witnesses several of its IGA franchise retailers who conceded that approximately 90% of their wholesale groceries came from Fleming and while not compelled to purchase from the franchisor, each emphasized that a potential competitor of Fleming would have to offer services at least equal to or better than those of Fleming for him to consider taking his business elsewhere.

Other services not covered by that fee arrangement include accounting services ranging from ordinary bookkeeping to the preparation of profit and loss statements, tax returns and similar items. Mr. Warren Lang, a certified management consultant officed in Kansas City, testified concerning the variety of services provided by Fleming, explaining that many of the services would not be available to competing retailers in rural areas because the cost of those services would be prohibitive if provided by a private firm with no tie-in to the purchase of groceries, and most certainly the cost of such services to the franchisee would exceed those paid by the retailer under the sales-service agreement. In addition, the management consultant fees are spread among the retailers and those with high volumes may pay a service fee sufficient to cover the cost of services provided by Fleming while smaller retailers obtain such services at a cost substantially lower than that available in the management consulting market. The expert testimony was that the scheme for provision of services, equipment and other things of value constitute a com-

pelling incentive for the retailers to continue their business with the franchisor vis-a-vis a competing distributor and gives Fleming a decided competitive edge.

Fleming indulges other practices providing a strong basis for influencing its franchisees. First, Fleming has provided loans to several of its Missouri franchise retailers who, in each case, had sought commercial loans but had failed in those efforts. Fleming assisted in attempting to arrange financing and charged no fee for this service. Thereafter, Fleming made direct loans to a number of these franchisees enabling them to acquire inventory and equipment. While Fleming's President expressed reluctance to making such loans, this practice extended not only to Missouri franchisees but those in other states. In at least one instance Fleming lent money directly to the grocer who was "in business with another wholesaler", and on receiving Fleming's loan, that grocer left the "other wholesaler" and "joined IGA" with whom he is still associated.

In addition to the loans and financial assistance, respondent purchases freezers, coolers and other grocery store equipment for the benefit of its franchised retailers. Under this scheme an order is placed by the retailer (franchisee) with respondent who, using its parent company, Fleming Foods Co. of Topeka, prospects for and purchases equipment bargains which are shipped to the retailer on the basis of respondent's cost plus 10%. There was some conflict in the testimony as to the profitability of this equipment operation and Mr. Richard Moore, Fleming's president, testified that while the over-all equipment purchase program showed a small profit, it was possible that some equipment might have been sold to a franchisee at less than Fleming's cost. The following portion of his testimony is pertinent:

Q. The 10% charge, though, to a particular retailer may not be tied in, may not reflect the actual outlay of money that you have made, though, in attempting to get him his equipment; is that correct?

A. *Probably it doesn't cover our cost,* but we don't keep track on each piece of equipment, each phone call we made, and all that. We don't break it down that fine, no. (Emphasis added).

As Moore testified, the equipment was purchased by Fleming and billed to Fleming, and then, "we turn around and rebill it to the customer and the customer pays us." Two of the franchise-retailers who testified as witnesses on Fleming's behalf stated they were able to obtain equipment through Fleming at a much lower price than had they shopped for the equipment on their own.

Moore described another service to franchisees available through "our store planning department". He explained how this department provides extensive services to retailers one of which had

our man ... tied up for six months. If you take all of his total time involved in the store design, all the rigmarole you go through with insurance people, getting the architects to design the building to meet the specifications that we recommend for the retailers, getting the equipment people to install the darned equipment the way it is supposed to be installed and operating. We make *very little, if any, money.*" (Emphasis added).

Emphasizing that this service had indeed benefited the franchisees, Moore added that at year's end if the department "made a dollar, we're lucky".

In addition, Fleming has in a number of instances leased grocery store buildings and by sublease (charging 5% above its own rent cost) made the properties available to franchise retailers, who because of insufficient resources had been unable to obtain a suitable location for leasing on their own. It is clear that Fleming's assets are obligated and "given", as that term is used in the statute, for the benefit of its franchisees as the leases in evidence require that Fleming remain primarily liable to pay "rents due and perform all the covenants ..." of the lease though the premises are assigned or sublet.

Witness Lang, the certified management consultant, opined that the variety of services and the close marketing relationship of

Fleming and its retailers provided an incentive for the retail grocer to continue its business with the franchisor as opposed to other distributors of milk and this relationship gave Fleming a decided competitive advantage.

To better understand the importance of this conclusion we examine respondent's present mode of operation. Though Fleming has not obtained the necessary license for distribution of milk and milk products in Missouri for its Missouri franchisees, Fleming places milk orders with Fairmont Dairy and the milk products are shipped directly from Fairmont to the retailer. Billing is accomplished by Fleming rather than Fairmont to the individual retailer and the milk received by the retailer is labeled by Fairmont under a private IGA label. Some of the strongest evidence in support of Lang's opinion and the corresponding conclusion of the administrative agency, that "[t]his competitive advantage would carry over into the sale of milk products," with the effect of unfairly diverting trade to the harm of competitors, came from three grocers (called by respondent) each of whom purchase approximately 90% of their grocery products from Fleming. They testified that the IGA labeled milk (distributed by Fairmont on Fleming's purchase orders) enjoyed the *first position* in their dairy cases and occupied space ranging from 65% to 80% of the entire space in the cabinets. On this record the Director made these findings of fact and conclusions of law:

### FINDINGS OF FACT

The Director finds the following facts:

1. Applicant is a Missouri corporation engaged in wholesale food distribution, supply and franchising of IGA retail grocery stores in a sixteen-county area in southwest Missouri, the northwest portion of Arkansas, the northeast portion of Oklahoma, and the southeast portion of Kansas. Applicant distributes wholesale groceries and supplies solely to IGA retailers who have entered into a trademark license agreement with applicant. Applicant distributes to approximately twenty-three retailers in Missouri and ninety-six retailers in the four state area.

2. Each IGA retailer enters into a sales-service plan with applicant's parent company, Fleming Foods Company of Topeka, Kansas.

3. Under the provisions of the sales-service plan agreement, each IGA retailer becomes entitled to certain services provided by applicant, the cost of which, with certain exceptions, is computed by reference to a fee schedule establishing service fees based on each retailer's purchases from applicant during a given four-week period. The service fee charged by applicant reflects, in the aggregate, the cost to applicant in providing services to its franchised retailers, applicant's warehouse and personnel overhead plus, in some cases, a certain degree of profit. Two exceptions to the inclusion of the cost of services in the fee schedule are the providing of bookkeeping and accounting services for an additional fee and the supplying of advertising mats at a cost of $6.50 each.

4. Among the services provided by applicant to its franchisees are the following:

(a) *Financial assistance.* (1) It is the practice of applicant to assist some of its franchised retailers in seeking commercial loans. When such loans cannot be obtained from any commercial source, applicant becomes the lendor, issuing fully secured loans at an interest rate somewhat above the "prime rate" quoted by banks in New York City. The franchised retailer is not charged a fee either for services rendered by applicant as a loan broker or for the initiation and processing of loans actually issued by applicant.

(2) Prior to the hearing on applicant's application for a license, several loans of this sort had been provided in Missouri and it is applicant's intention to provide such service in the future. Loan moneys have been used for equipment purchases, inventory purchases and other aspects of a retailer's business. In at least one instance a loan was provided to prevent a retailer from going bankrupt.

(b) *Equipment Sales to Franchised Retailers.* (1) Applicant assists retailers in the purchase of grocery store equipment such as freezers, coolers and the like. Applicant, using its parent company, Fleming Foods of Topeka, Kansas, attempts to locate and purchase such equipment which is in turn shipped directly to the franchised retailers, the franchised retailer being charged applicant's costs plus ten percent.

(2) Although applicant's equipment purchase program shows a small profit, in some specific instances, the ten percent profit margin does not cover applicant's costs in securing the equipment.

(3) In some cases a franchised retailer was able to obtain equipment through applicant at a much lower price than could otherwise be obtained on the open market.

(c) *Other Services.* (1) Applicant provides certain services in the nature of subleasing of grocery store buildings and property to its franchised retailers. Applicant charges a retailer an amount equal to its own rent plus five percent. Applicant only leases property for the purpose of subletting it to its retailers if the retailer does not have sufficient assets and capital to obtain such lease in its own right.

(2) Applicant provided one of its franchised retailers a promotional allowance so that the retailer could meet competition from other retailers in its market area which would constitute a violation of Chapter 416, RSMo and regulations issued thereunder.

5. Many franchised retailers of applicant purchase approximately ninety percent of their wholesale groceries from applicant.

6. Applicant currently fills its milk and milk product needs to a certain extent by utilizing the services of Fairmont Foods of Kansas City, Missouri. Fairmont Foods is a licensed processor and distributor of milk and milk products. Orders for such items are placed with applicant which are forwarded to Fairmont. Fairmont distributes the applicant's private label milk directly to applicant's franchised retailers and bills applicant directly. In many cases, this private label milk occupies first position in the franchised retailer's dairy case and frequently takes up the greatest percentage of all milk located therein.

7. Although applicant's franchised retailers are not compelled to purchase wholesale groceries from applicant, the various services offered by applicant provide a strong incentive for its retailers to continue participation in the sales-service program.

8. Many of the services provided by applicant would not be available to competing retailers in rural areas because the cost of providing those services would be prohibitive to such competing retailers. The providing of such services by a private consulting firm or other source would have to be at a cost much greater than that paid by the franchised retailers of applicant under its service-sales plan agreement and service fee schedule. Although some retailers with high volume purchases pay service fees sufficient to cover the costs of services provided by applicant, smaller retailers would essentially be provided services at a cost substantially lower than that found in the management consulting market because of lower volume sales. Additionally, accounting services provided by applicant at an additional charge over and above the fee for the service sales plan agreement would be much more costly if such services were found and acquired on the open market.

9. The various services provided by applicant to its franchised retailers including the granting of financial assistance, the providing of brokerage and purchasing assistance in the acquisition of grocery store equipment, the providing of real estate leasing services, the providing of accounting services at low cost, and the providing of other services such as promotional allowances constitutes the giving of things of value by applicant to its franchised retailers. Although there are appearances that giving of such services is the result of ongoing arms-length transactions, the various services would not be provided but for the franchise agreements. But for the franchise agreement, the services would be available to the franchised retailers only at

greater cost and in many cases such services would not be available under any circumstances. Further, such services if available to competitors not having the availability of a franchise agreement such as that offered by applicant could avail themselves of such services only at cost exceeding the cost to the franchised retailers.

## CONCLUSIONS OF LAW

The Director makes the following conclusions of law:

1. If applicant's application for license is granted, it would be a "distributor" within the meaning of Section 416.410(7), RSMo and 2 C.S.R. 40–3.010(5) and thus would have to comply with the provisions of Chapter 416, RSMo and regulations issued thereunder.

2. The system whereby applicant acts as a loan broker for the obtaining of commercial loans and as a lendor of last resort without charging any fee for such brokerage and loan services constitutes "financial aid" as the phrase is used in Section 416.440, RSMo.

3. The system whereby applicant and its parent company purchases and resells equipment on behalf of and to applicant's franchised retailers constitutes the giving of a "thing of value" as contemplated by Section 416.440, RSMo. The items of equipment so purchased constitute equipment as contemplated by 2 C.S.R. 40–3.010(13).

4. The system whereby applicant leases and thereafter subleases grocery store premises for the specific benefit of its franchised retailers which would otherwise be unable to lease such premises constitutes the giving of a "thing of value" as contemplated by Section 416.440.1, RSMo and 2 C.S.R. 40–3.020(18).

5. The system whereby applicant provides promotional allowances to allow a franchised retailer to meet local competition, and whereby accounting services are provided to its franchised retailers at a cost less than would otherwise be charged for the same or similar services outside of applicant's system constitutes the giving of "things of value" as contemplated by Section 416.440.1, RSMo and regulations issued thereunder.

6. The giving or granting of services and things of value by applicant as described in these Findings of Fact and Conclusions of Law to its franchised retailers gives said franchised retailers a decided competitive advantage in the franchised retailer's marketing areas because the same services are not generally available or are available only at a greater cost, to competitors of said franchised retailers. This competitive advantage would carry over into the sale of milk products, the distribution of which requires the license for which applicant has applied. Therefore, the giving and granting of such services and things of value would have the effect of unfairly diverting trade from competitors in the field of milk and milk product sales resulting in injury to such competitors, destruction of competition and a tendency to create a monopoly favoring applicant's franchised retailers.

7. The carrying on of the activities delineated in paragraphs 3 through 8 of the Findings of Fact, herein, and paragraphs 1 through 5 of the Conclusions of Law would constitute violations of the Missouri Unfair Milk Sales Practices Law, Sections 416.410–416.560, RSMo and regulations issued thereunder but for the fact that applicant does not in fact currently distribute fluid milk or fluid milk products to its franchised retailers in Missouri.

8. The issuance of a license to distribute fluid milk and fluid milk products in Missouri in accord with the provisions of the Missouri Unfair Milk Sales Practices Law, Section 416.410–416.560 and regulations issued thereunder would put applicant in violation of said law and regulations at the very instant that such license is granted and issued. Therefore, applicant cannot hold a license for the distribution of fluid milk and fluid milk products in Missouri and at the same time continue its grocery and food distribution system which would include the distribution of fluid milk and fluid milk products subject to regulation by Sections 416.410–416.560 and regulations issued thereunder.

9. The extensive evidence introduced by applicant regarding the effects upon competition of the Missouri Unfair Milk Sales Practices Law, Section 416.410–416.560, RSMo and regulations issued thereunder, although having merit with regard to the policy questions underlying said law and regulations, does not address the issue of applicant's compliance with said law and is therefore irrelevant to this proceeding. Such policy questions are in the domain of the Missouri General Assembly to which said questions should be addressed.

10. All the conclusions of law implicit in the above Findings of Fact are hereby made.

### ORDER

WHEREFORE, IT IS ORDERED that the application of Fleming Foods, Inc. of Missouri for a license to distribute fluid milk and fluid milk products in accordance with the Missouri Unfair Milk Sales Practices Law, Sections 416.410–416.560 and regulations issued thereunder be and is hereby denied.

■ In our review of these findings we consider the evidence in the light most favorable to the administrative body, together with all reasonable supportive inferences and if the evidence permits either of two opposed findings, we should accept the findings of the administrative body. *See, Hermel, Inc. v. State Tax Commission*, 564 S.W.2d 888 (Mo.1978).

Under the provisions of § 416.490, RSMo 1978, it is unlawful for Fleming, or any person, to operate as a milk processor or a distributor [4] of milk or milk products unless licensed under the Act. Such license may issue only upon application to the Director who is empowered to refuse to issue a license if the Director, after a public hearing, "has found that the applicant has violated" any of the provisions of the Act.

The extensive list of trade practices prohibited to licensees enumerated in 416.440.1 includes *giving* or *offering to give* rebates, discounts, free services, advertising allowance, donations, free merchandise, (pay for) advertising space used jointly, rent on space used by the retailer for storing or displaying the milk distributor's merchandise, *financial aid*, free equipment *or any thing of value.* In determining whether the record supports the findings of the Director we must *first* decide if the proof supports the fact of Fleming's "giving or offer to give" any "thing of value" or "financial aid" to "any milk product purchaser". *Second*, we must determine if the services or things of value were given or offered "with the intent" or "with the effect" of unfairly diverting trade from a competitor or otherwise injuring a competitor or of destroying competition or of creating monopoly. *See, State ex rel. Thomason v. Adams Dairy Co.,* 379 S.W.2d 553 (Mo.1964).

Under Fleming's sales-service plan agreement, each franchisee-grocer is entitled to a variety of services provided by Fleming, the cost of which is based on a fee schedule computed each four weeks from the retailer's purchases from Fleming. The schedule is intended to reflect the cost to Fleming of providing those services to its retailers and to cover warehouse and personnel overhead as well as (in some cases) a degree of profit. Additionally, as previously discussed, Fleming provides bookkeeping and accounting services for a separate or additional fee and these at bargain (in some cases less than cost) prices. The Director was justified in his finding that by these practices Fleming gave "financial aid" and other "things of value" to its "milk product purchasers" and without question the same may be said of Fleming's activity as a loan broker for its retailers when such loans were not otherwise available from commercial sources. This is especially true of the direct loans to the retailers who, for a variety of reasons, were unable to raise the necessary capital for the purchase of equipment and merchandise. As noted above, in one instance a prospective retailer had arrived at or was

---

**4.** The term distributor is defined in § 416.-410(7) of the Act as "any person, other than a bulk milk handler, engaged in the business of transferring title within the state to milk products for a consideration, where the product is to be sold for resale or further processing . . ."

verging on insolvency and the infusion of Fleming's money, though at an interest rate somewhat above the "prime rate", most certainly constituted the giving of financial aid and something of value.

In addition, Fleming assists its franchisees in the purchase of grocery store equipment such as freezers and coolers by scouting the market for advantageous prices and arranging direct shipment to the retailers for cost plus 10%. While this equipment purchase program apparently shows a small profit in some instances, in the overall scheme the 10% charge does not cover Fleming's cost of securing the equipment. From the retailer's point of view, the benefit is readily apparent from the testimony of those grocers who stated they were able to obtain equipment through Fleming at a lower price than could have otherwise been obtained in the open market. Though it has been argued this activity does not constitute giving "*free* merchandise" (another of the proscribed practices of 416.440.1) (emphasis added), it nevertheless falls within the prohibitions as to "financial aid" and "any other thing of value", and the evidence supports the Director's findings and conclusion in this regard. By the same token leasing real property for the purpose of providing the same to its franchisees, who are otherwise unable to obtain proper store facilities, is possible only though the commitment of Fleming's assets, for it is Fleming who becomes obligated for the payment of rents and performance of all the lease terms and that obligation continues though the property is assigned or sublet to the grocer. Without question the franchisor's obligation on the lease is the indispensable consideration. Without Fleming's presence and financial commitment the franchisee would otherwise be unable to obtain such premises and this arrangement constitutes the giving of a "thing of value" within the meaning of § 416.440.1.

The same may be said for the accounting and tax consultant service furnished to the retailers at fees less than would be charged for similar services to those outside the system and the "store planning department" which offers a variety of services such as store design, architectural support and assistance in obtaining insurance. These too are offered on an almost no profit basis and in one instance "tied up" Fleming's man for a single retailer for six months and from which Fleming makes "very little, if any, money". This constitutes giving financial aid and other things of value. These and the variety of items previously discussed provide a competitive advantage for Fleming in obtaining and keeping its retailers. There can be no question that this competitive edge would carry into the direct sale of milk products, the distribution of which requires the license Fleming seeks. The giving of such services and things of value is clearly intended to and would have the effect of diverting trade from competing distributors in the field of milk and milk product sales. This broad range of trade practices and the integrated system of service and sale is precisely of the sort which the Unfair Milk Sales Practices Act is designed to control and prevent. While Fleming remains free to continue its activities in the sale of groceries and other products, a refusal of the milk license application was justified in the case at bar. This extensive ongoing system of financial aid and things of value is clearly distinguishable from the three day "introductory sales promotion" countenanced in *State ex rel. Thomason v. Adams Dairy Co.*, 379 S.W.2d 553 (Mo.1964), and the four day loss leader held insufficient to warrant issuance of an injunction in *State ex rel. Davis v. Thrifty Foodliner, Inc.*, 432 S.W.2d 287 (Mo.1968). In this connection the conclusion of the court in *Davis* at 291 is appropriate where it is stated, "Our determination of this case is necessarily limited to the facts and circumstances of record. Each case must be determined on its own peculiar facts and circumstances." That appropriately limiting language of *Davis* not only describes the narrow scope of that decision but makes clear the Court did not intend a construction of the statute permitting a broad scheme of the sort here devised; instead, such scheme is forbidden by the Act.

Similarly, *Foremost Dairies, Inc. v. Thomason*, 384 S.W.2d 651 (Mo. banc 1964), in which this Court decided the narrow issue that the term "discount" as used in the Act was not intended to include cost justified volume price differentials, provides no authority for overturning the Director's decision. While those cited cases did not involve the issues here before us, the narrow scope of their facts and the limiting language in those decisions offer effective support for our decision here affirming the order of the Director and reversing the judgment of the trial court. There is no question that the franchisee-grocers, though not expressly forced to buy only from Fleming, or to give a special advantage, in fact give such an edge to their franchisor and understandably give milk bearing the IGA label a great majority of the space and the first position of their retail dairy cases. In one instance a retailer admitted changing from another distributor to Fleming and other franchisees testified unequivocally it would take a remarkably strong showing by a competitor to have them break their relationship with their franchisor.[5] It should be remembered, 90% of their wholesale grocery purchases are from Fleming. The evidence demonstrates that if a milk license were obtained Fleming intends to continue its trade practices discussed herein, hence, the Director was correct in stating such practices "would put applicant in violation of said law ... at the very instant that such license is granted and issued." The application was properly refused. The judgment of the trial court is reversed and the cause remanded with directions that judgment be entered affirming the Director's denial of the application of Fleming Foods, Inc., of Missouri, for a license to distribute fluid milk and fluid milk products under the Missouri Unfair Milk Sales Practices Law.

5. Fleming argues that the vertically integrated supermarkets have their own warehouses and are distributing their own "private label milk". From this the question has been raised that if the Fleming practice is impermissible under the milk act, would not similar practices of other wholesalers in the area be likewise subject to control under the Act.

DONNELLY, C. J., and MORGAN and HIGGINS, JJ., concur.

WELLIVER, J., dissents in separate dissenting opinion filed.

BARDGETT, J., dissents and concurs in separate dissenting opinion of WELLIVER, J.

SEILER, J., not participating.

WELLIVER, Judge, dissenting.

I respectfully dissent.

It is clear from the record that the Director of Agriculture never intended to issue respondent a license to distribute milk. Although the parties agree that the Department of Agriculture bore the burden of proof, *see State ex rel. Thomason v. Adams Dairy Co.*, 379 S.W.2d 553, 555 (Mo.1964), it is apparent that the Director had, for all practical purposes, determined before the hearing that the license should and would be denied. At the beginning of the hearing the Director made the following opening statement:

DIRECTOR RUNYAN: I would like to call this hearing to order.

. . . .

The purpose of this hearing is to determine whether a milk products distributor's license should be *refused* to Fleming Foods of Missouri, Incorporated.

*Grounds upon which application of Fleming Foods of Missouri, Incorporation* [sic], *for a milk distributor's license may be refused are as follows:*

*If issued the license, Fleming Foods of Missouri will be unable to comply with the provisions of Section 416.440, Revised Missouri Statutes, Missouri 1969, due to the extensions of credit and financing provided their retail customers.*

The answer quite simply is that neither Fleming nor any other wholesaler in the area is subject to the Act as to their sale of groceries nor are their competitive sales practices prohibited by the terms of § 416.440. However, both Fleming and its competitors are subject to the Act if they become "distributors" for the sale and dissemination of milk products as that term is defined by the statute.

*Secondly, if issued a license, Fleming Foods of Missouri would be unable to comply with the provisions of Section 416.440 of Revised Statutes of Missouri 1969, due to this company providing [g]rocery and dairy equipment to their retail customers.*

*Thirdly, if issued a license, Fleming Foods of Missouri would be unable to comply with Section 416.440, Revised Statutes of 1969, since this company either provides or offers to provide free services and other things of value to their retail customers.*

(Emphasis added.) The language is substantially similar to that used in the notice of hearing that the Director sent respondent on July 7, 1977, and virtually the same language subsequently became his findings of fact and conclusions of law. The extended hearing[1] was but an empty formality.

The scope of our review is set forth in § 536.140, RSMo 1978.[2] We must not, however, so defer to the agency that we abdicate our judicial function. This is especially true in cases such as this in which the agency acts as much as an advocate as it does an impartial tribunal. When it is clear that the agency has decided the case before the hearing ever is conducted, we should not give it the blind deference that the principal opinion appears to accord the Director of Agriculture.

Respondent is a wholesale food distributor in Joplin, Missouri. It franchises and supplies independent IGA retail grocery stores in sixteen Southwest Missouri counties and in parts of Arkansas, Kansas, and Oklahoma. Respondent's franchisees enter into a sales-service plan agreement with respondent under which respondent for a fee provides counseling services on store location and layout, merchandising, advertising and special promotions, public relations, and expansion or diversification. The fee for each four weeks is computed on the amount of each franchisee's grocery purchases from respondent during the preceding four week period. Respondent also provides accounting services for an additional fee based upon the range of services that a retailer utilizes. In addition, respondent has infrequently assisted its franchisees in obtaining loans, has loaned money to them, has leased property for sublease to them, and has assisted them in the purchase of equipment.

Respondent ships IGA label milk from its warehouse on its own trucks to its franchisees in Arkansas, Kansas, and Oklahoma, and it seeks a license to do so in Missouri. Presently, Fairmont Foods of Kansas City, a milk processor, ships IGA milk directly to respondent's Missouri franchisees. Respondent estimates that it could lower the delivered wholesale price of milk ten cents per gallon if it were allowed to receive Fairmont's milk shipments at its warehouse and distribute the milk on its own refrigerated trucks, which deliver other items to the franchised Missouri stores daily. The Director denied respondent a license because, he concluded, the provision of such services would violate § 416.440(1), RSMo 1969,[3] of the Unfair Milk Practices Act.[4]

---

1. The hearing lasted two days. Ten witnesses testified, and 42 exhibits were admitted into evidence. The testimony fills 388 pages in the transcript.

2. Section 536.140(2), RSMo 1978, provides in relevant part that:

The inquiry may extend to a determination of of whether the action of the agency
(1) Is in violation of constitutional provisions;
(2) Is in excess of the statutory authority or jurisdiction of the agency;
(3) Is unsupported by competent and substantial evidence upon the whole record;
(4) Is, for any other reason, unauthorized by law;

(5) Is made upon unlawful procedure or without a fair trial;
(6) Is arbitrary, capricious or unreasonable;
(7) Involves an abuse of discretion.

3. Section 416.440(1) provides:

No milk processor or distributor shall, with the intent or with the effect of unfairly diverting trade from a competitor, or of otherwise injuring a competitor, or of destroying competition, or of creating a monopoly, give or offer to give any milk product purchaser any rebate, discount, free service or services, advertising allowance, pay for advertising

The record simply does not support the Director's finding that respondent would violate the statute. The statute provides that milk processors or distributors may not (1) with the intent or effect of (2) unfairly (3) diverting trade from or injuring a competitor, destroying competition, or creating a monopoly (4) give or offer to give to any milk product purchaser anything that the statute proscribes.

There is not one line of testimony of intent to divert trade from or injure a competitor, destroy competition, or create a milk monopoly. There is not one line of testimony that respondent franchisor has *given*[5] anything to its franchisees for the purpose of creating a milk monopoly. Respondent's president testified that "[o]ur company provides nothing free to the retailer." There is no evidence to the contrary. Respondent made direct loans to its franchisees only as a last resort, when loans from conventional sources were unavailable, and it did so only at a rate of interest greater than the established prime rate. When respondent leased property for sublease to its franchisees, respondent charged

rent on the sublease at five percent more than it paid on the principal lease. When respondent assisted its franchisees in the purchase of equipment, it charged them ten percent more than the cost of equipment to respondent.[6] Finally, respondent charged more for its accounting services than the services themselves cost respondent. Under the sales-service plan agreement, franchisees pay for all services except accounting regardless of whether they take advantage of them. None of the services is free.[7]

Even if respondent's sale of franchise services could be considered, by some stretch of the imagination, "giving" of services within the meaning of the statute, the record does not support the principal opinion's summary conclusion that "[t]he giving of such services and things of value is clearly intended to and would have the effect of diverting trade from competing distributors in the field of milk and milk products sales." Respondent's franchisees are not required under their agreements with respondent to purchase any or all of their inventory from respondent. Neither are they under any compulsion to do so. Such

---

space used jointly, donation, free merchandise, rent on space used by the retailer for storing or displaying the milk processor's or distributor's merchandise, financial aid, free equipment, or any other thing of value; except the bona fide return by a cooperative association to its members on a patronage basis of the savings realized on products sold and distributed to the members or patrons. The statute as codified in RSMo 1978 is identical to the one codified in RSMo 1969, which is involved in this case.

4.  One would have to be an ostrich with his head in the sand to fail to recognize that the Unfair Milk Practices Act, §§ 416.410–.560, RSMo 1978, although couched in antimonopoly terms, has as its ultimate goal the supporting of milk prices.

5.  This Court has noted that "[d]isregarding for the moment the word 'discount,' it will be noted that the other words and clauses [in § 416.-440(1) ] all carry the connotation of a donation or a discriminatory gift." *Foremost Dairies, Inc. v. Thomason*, 384 S.W.2d 651, 660 (Mo. banc 1964). It seems clear that a discount, as well, is in a strict sense gratuitous. We must construe nontechnical words in "their plain or ordinary and usual sense," § 1.090, RSMo 1978, and "give" means to "transfer ownership

or possession without compensation" or to "bestow upon another gratuitously or without consideration," Black's Law Dictionary 620 (5th ed. 1979).

6.  The principal opinion states that "[w]hile this equipment purchase program apparently shows a small profit in some instances, in the overall scheme the 10% charge does not cover Fleming's cost of securing the equipment." That assertion is contrary to fact. The uncontradicted testimony of respondent's president was that "[w]e're not giving them any equipment, I assure you. . . . That operation does show a profit. Not an outlandish profit, by any means. It does show a profit. Certainly it shows a profit. We wouldn't stay in business if we didn't show a profit."

7.  It is irrelevant that respondent's franchisees received services from respondent at a cost less than they could have obtained on the open market. This is not to suggest that transactions made at less than arm's length should not receive greater scrutiny. Sham transactions at artificially low prices may well violate § 416.-440(1). Nothing in the record of this case, however, suggests that respondent's agreements with its franchisees were made at less than arm's length.

an arrangement was not a prerequisite for the loans that respondent has provided some of its franchisees. Furthermore, of respondent's twenty-three franchisees in Southwest Missouri, ten do not participate in the milk program. The principal opinion points out that one retailer admitted switching from another distributor to respondent, but nothing in the record suggests that it was to the exclusion of other milk producers or distributors. In fact, one retailer indicated that he would continue to sell Foremost and Hiland milk as well as IGA even if respondent were granted a license to distribute milk.

Neither could respondent destroy competition or create a monopoly if it were granted a license. Respondent operates in only sixteen Southwest Missouri counties. Just thirteen of its Missouri franchisees, participate in its milk program. Respondent occupies only 9.4% of the market within its operating area. In 1977, the year in question, respondent's fluid milk sales in Southwest Missouri totaled only $403,000. With its small size, there can be little doubt that respondent could neither intend nor effect adverse market consequences.

Finally, nothing in the record suggests that respondent's actions are unfair. Respondent is not primarily in the milk business. The milk it would distribute were it granted a license would be just one of several thousand items that it distributes. Respondent desires only to permit its franchisees to compete with the large chain stores and competing grocery distributors that themselves provide services similar to those that respondent sells to its franchisees. The Director's expert witness testified that "it is a very common and competitive process of supplying these services." Thus,

> [t]he evidence shows only a recognized and frequently used practice in the ... industry, which has a legitimate business purpose and which has never heretofore been considered as against public policy or as characterized by deception, bad faith or fraud, and which did not in fact

result in any substantial diversion of trade.

*Adams Dairy*, 379 S.W.2d at 556.

We should not place our imprimatur on what amounts to an artificial price support scheme. Nothing in the record requires the result the principal opinion reaches. The trial court summarily concluded that "the finding of the Director of Agriculture was not supported by competent and substantial evidence upon the whole record and is unauthorized by law." Our conclusion should be the same. The judgment of the trial court should be affirmed.